731 S.E.2d 550

**ADOPTIVE COUPLE, Appellants,**

v.

**BABY GIRL, a minor child under the age of fourteen years, Birth Father, and the Cherokee Nation, Respondents.**

No. 27148.

Supreme Court of South Carolina.

Heard April 17, 2012.
Decided July 26, 2012.
Rehearing Denied Aug. 22, 2012.

Mark D. Fiddler, of Minneapolis, Minnesota, Raymond W. Godwin and Julie M. Rau, both of Greenville, and Robert Norris Hill, of Newberry, all for Appellants.

John S. Nichols, of Bluestein, Nichols, Thompson & Delgado, of Columbia, Lesley Ann Sasser and Shannon Phillips Jones, both of Charleston, all for Respondent, Birth Father.

Chrissi R. Nimmo, of Tahlequah, Oklahoma, for Respondent, Cherokee Nation.

James Fletcher Thompson, of Spartanburg, and Philip McCarthy, of Flagstaff, Arizona, for Amicus Curiae, the American Academy of Adoption Attorneys.

Dione Cherie Carroll, of Miami, Florida, for Amici Curiae, the Catawba Indian Nation, the North American Council on Adoptable Children, the Child Welfare League of America, the National Indian Child Welfare Association, and the Association on American Indian Affairs.

Thomas P. Lowndes, Jr., of Charleston, for the Guardian ad Litem.

Chief Justice TOAL.

This case involves a contest over the private adoption of a child born in Oklahoma to unwed parents, one of whom is a member of the Cherokee Nation. After a four day hearing in September 2011, the family court issued a final order on November 25, 2011, denying the adoption and requiring the adoptive parents to transfer the child to her biological father. The transfer of custody took place in Charleston, South Carolina, on December 31, 2011, and the child now resides with her biological father and his parents in Oklahoma. We affirm the decision of the family court denying the adoption and awarding custody to the biological father.

## FACTS/PROCEDURAL HISTORY

Father and Mother are the biological parents of a child born in Oklahoma on September 15, 2009 ("Baby Girl"). Father and Mother became engaged to be married in December 2008, and Mother informed Father that she was pregnant in January 2009.[1] At the time Mother became pregnant, Father was actively serving in the United States Army and stationed at Fort Sill, Oklahoma, approximately four hours away from his hometown of Bartlesville, Oklahoma, where his parents and Mother resided.[2] Upon learning Mother was pregnant, Father began pressing Mother to get married sooner.[3] The couple continued to speak by phone daily, but by April 2009, the relationship had become strained. Mother testified she ultimately broke off the engagement in May via text message because Father was pressuring her to get married. At this point, Mother cut off all contact with Father. While Father testified his post-breakup attempts to call and text message Mother went unanswered, it appears from the Record Father did not make any meaningful attempts to contact her.

It is undisputed that Mother and Father did not live together prior to the baby's birth and that Father did not support Mother financially for pregnancy related expenses, even though he had the ability to provide some degree of financial

---

1. Father has a daughter from a prior marriage whom he supports through a deduction in his military pay and who was six years old at the time of the engagement. Mother claims that Father has another daughter whom he does not support, but this was never substantiated by the evidence. Mother has two other children from a prior relationship.

2. Father served honorably in both Operation Iraqi Freedom and Operation New Dawn and received a Bronze Star for his service. He is now a member of the National Guard and works as a security guard.

3. The testimony of Mother and Father surrounding the circumstances of the parties' relationship during this time is conflicting. For example, Father testified he was "very happy" when he learned they were expecting a child and claimed he desired to get married sooner so that the child would not be born out of wedlock. On the other hand, Mother testified Father "didn't really have a reaction" and "every time [she] would bring it up, he really didn't say a whole lot," and stated Father pressured her to get married for monetary purposes because the military would increase his pay for "family living."

assistance to Mother.[4]

In June 2009, Mother sent a text message to Father asking if he would rather pay child support or surrender his parental rights. Father responded via text message that he would relinquish his rights, but testified that he believed he was relinquishing his rights to Mother. Father explained: "In my mind I thought that if I would do that I'd be able to give her time to think about this and possibly maybe we would get back together and continue what we had started." However, under cross-examination Father admitted that his behavior was not conducive to being a father. Mother never informed Father that she intended to place the baby up for adoption. Father insists that, had he known this, he would have never considered relinquishing his rights.

Mother testified she chose the adoption route because she already had two children by another father, and she was struggling financially. In June 2009, Mother connected with Appellants (or "Adoptive Mother" or "Adoptive Father") through the Nightlight Christian Adoption Agency (the "Nightlight Agency"). She testified she chose them to be the parents of the child because "[t]hey're stable.... they're a mother and father that live inside a home where she can look up to them and they can give her everything she needs when needed."

Appellants reside in Charleston, South Carolina, and were married on December 10, 2005. Adoptive Mother has a Master's Degree and a Ph.D. in developmental psychology and develops therapy programs for children with behavior problems and their families. Adoptive Father is an automotive body technician currently working for Boeing. They have no other children. After connecting, Mother spoke with Appellants weekly by telephone, and Adoptive Mother visited Mother in Oklahoma in August 2009. Appellants provided financial assistance to Mother during the final months of her pregnancy and after Baby Girl's birth. Adoptive Mother testified Mother

---

4. Mother testified she asked Father for financial assistance before she made her first pre-natal doctor's appointment, and Father stated he would not assist her financially unless they were married. Father denies that Mother asked for financial assistance and testified he would have supported her if she had asked.

consistently represented that the birth father was not involved.

Mother testified that she knew "from the beginning" that Father was a registered member of the Cherokee Nation, and that she deemed this information "important" throughout the adoption process.[5] Further, she testified she knew that if the Cherokee Nation were alerted to Baby Girl's status as an Indian child, "some things were going to come into effect, but [she] wasn't for [sic] sure what." Mother reported Father's Indian heritage on the Nightlight Agency's adoption form and testified she made Father's Indian heritage known to Appellants and every agency involved in the adoption. However, it appears that there were some efforts to conceal his Indian status. In fact, the pre-placement form reflects Mother's reluctance to share this information:

> Initially the birth mother did not wish to identify the father, said she wanted to keep things low-key as possible for the [Appellants], because he's registered in the Cherokee tribe. It was determined that naming him would be detrimental to the adoption.

Appellants hired an attorney to represent Mother's interests during the adoption. Mother told her attorney that Father had Cherokee Indian heritage. Based on this information, Mother's attorney wrote a letter, dated August 21, 2009, to the Child Welfare Division of the Cherokee Nation to inquire about Father's status as an enrolled Cherokee Indian. The letter stated that Father was "1/8 Cherokee, supposedly enrolled," but misspelled Father's first name as "Dustin" instead of "Dusten" and misrepresented his birthdate. (emphasis added).

Because of these inaccuracies, the Cherokee Nation responded with a letter stating that the tribe could not verify Father's membership in the tribal records, but that "[a]ny incorrect or omitted family documentation could invalidate this determination." Mother testified she told her attorney that the letter was incorrect and that Father was an enrolled member, but that she did not know his correct birthdate. Adoptive Mother testified that, because they hired an attorney

---

5. Mother testified that she believed she also had Cherokee heritage, but she was not a registered member of the Cherokee Nation.

to specifically inquire about the baby's Cherokee Indian status, "when she was born, we were under the impression that she was not Cherokee."[6] Any information Appellants had about Father came from Mother.

When Mother arrived at the hospital to give birth, she requested to be placed on "strictly no report" status, meaning that if anyone called to inquire about her presence in the hospital, the hospital would report her as not admitted.[7] Mother testified that neither Father nor his parents contacted her while she was in the hospital.

Adoptive Mother and Adoptive Father were in the delivery room when Mother gave birth to Baby Girl on September 15, 2009. Adoptive Father cut the umbilical cord. The next morning, Mother signed forms relinquishing her parental rights and consenting to the adoption.

Appellants were required to receive consent from the State of Oklahoma pursuant to the Oklahoma Interstate Compact on Placement of Children ("ICPC") as a prerequisite to removing Baby Girl from that state. Mother signed the necessary documentation, which reported Baby Girl's ethnicity as "Hispanic" instead of "Native American." After Baby Girl was discharged from the hospital, Appellants remained in Oklahoma with Baby Girl for approximately eight days until they received ICPC approval, at which point they took Baby Girl to South Carolina. According to the testimony of Tiffany Dunaway, a Child Welfare Specialist with the Cherokee Nation, had the Cherokee Nation known about Baby Girl's Native American heritage, Appellants would not have been able to remove Baby Girl from Oklahoma.[8]

---

**6.** Adoptive Mother testified that the Nightlight Agency's pre-placement report was "probably . . . something I read and didn't think twice about it."

**7.** Mother testified that she chose this option in both of her previous births primarily to prevent the father from contacting her.

**8.** Dunaway testified that had "Native American" been circled on the ICPC form, the ICPC administrator would have contacted her supervisor directly. Whether or not the Cherokee Nation would have ultimately allowed the adoption to go forward is a matter of tribal law. However, the testimony establishes the tribe would not have consented to Baby Girl's removal at that time, triggering the denial of Appellants'

Father was aware of Mother's expected due date, but made no attempt to contact or support Mother directly in the months following Baby Girl's birth.[9]

Appellants filed the adoption action in South Carolina on September 18, 2009, three days after Baby Girl's birth, but did not serve or otherwise notify Father of the adoption action until January 6, 2010, approximately four months after Baby Girl was born and days before Father was scheduled to deploy to Iraq. On that date outside of a mall near his base, a process server presented Father with legal papers entitled "Acceptance of Service and Answer of Defendant," which stated he was not contesting the adoption of Baby Girl and that he waived the thirty day waiting period and notice of the hearing. Father testified he believed he was relinquishing his rights to Mother and did not realize he consented to Baby Girl's adoption by another family until after he signed the papers. Upon realizing that Mother had relinquished her rights to Appellants, Father testified, "I then tried to grab the paper up. [The process server] told me that I could not grab that [sic] because ... I would be going to jail if I was to do any harm to the paper."

After consulting with his parents and a JAG lawyer at his base, Father contacted a lawyer the next day, and on January 11, 2010, he requested a stay of the adoption proceedings under the Servicemember's Civil Relief Act ("SCRA"). On January 14, 2010, Father filed a summons and complaint in an Oklahoma district court to establish paternity, child custody, and support of Baby Girl. The complaint named Appellants and Mother as defendants.[10] Paragraph 12 of this Complaint

---

ICPC application, and Appellants would not have been able to transport Baby Girl to South Carolina.

9. Father testified he asked friends and family if they had seen Mother because she would not reply to his text messages. His mother testified she attempted to contact Mother on several occasions and once left Mother a voice message before Baby Girl's birth to tell Mother she had money and some gifts for the baby, including items she hand-knitted, but Mother never returned her telephone calls. Mother testified that none of Father's family members contacted her regarding gifts for Baby Girl.

10. Upon receipt of this complaint, Appellants were first put on notice that Father was contesting the adoption.

stated, "Neither parent nor the children have Native American blood. Therefore the Federal Indian Child Welfare Act ... and the Oklahoma Indian Child Welfare Act ... do not apply." Father departed for Iraq on January 18, 2010, with his father acting as power of attorney while he was deployed overseas.[11]

On March 16, 2010, Appellants, with Mother joining, filed a Special Appearance and Motion to Dismiss Father's Oklahoma action on jurisdictional grounds. The motion was granted, thereby ending the Oklahoma custody action.

Meanwhile, in January 2010, the Cherokee Nation first identified Father as a registered member and determined that Baby Girl was an "Indian Child," as defined under the Federal Indian Child Welfare Act, 25 U.S.C. § 1901, *et seq.* (the "ICWA"). It is not apparent from the Record when Appellants were made aware of this change, but on March 30, 2010, Appellants amended their South Carolina pleadings to acknowledge Father's membership in the Cherokee Nation. Accordingly, on April 7, 2010, the Cherokee Nation filed a Notice of Intervention in the South Carolina action.[12]

On May 6, 2010, the family court ordered paternity testing which conclusively established Father as the biological father of Baby Girl, and Appellants have since acknowledged Father's paternity. Furthermore, the family court issued an order confirming venue and jurisdiction in Charleston County Family Court and lifting the automatic stay of proceedings under the SCRA. On May 25, 2010, Father answered Appellants' amended complaint, stating he did not consent to the adoption of Baby Girl and seeking custody. By temporary order dated July 12, 2011, the family court set a hearing date for the case, and found separately that the ICWA applied to the case.

The trial of the case took place from September 12–15, 2011. A Guardian *ad Litem* ("GAL") represented the interests of

---

11. Father did not return to the United States until December 26, 2010.

12. On April 19, 2010, Father filed an amended complaint that modified paragraph 12 of his previous complaint to read: "Both the father and the child have Native American blood. Therefore the Federal Indian Child Welfare Act ... and the Oklahoma Indian Child Welfare Act ... do apply."

Baby Girl. On November 25, 2011, the family court judge issued a Final Order, finding that: (1) the ICWA applied and it was not unconstitutional; (2) the "Existing Indian Family" doctrine was inapplicable as an exception to the application of the ICWA in this case in accordance with the clear modern trend; (3) Father did not voluntarily consent to the termination of his parental rights or the adoption; and (4) Appellants failed to prove by clear and convincing evidence that Father's parental rights should be terminated or that granting custody of Baby Girl to Father would likely result in serious emotional or physical damage to Baby Girl. Therefore, the family court denied Appellants' petition for adoption and ordered the transfer of custody of Baby Girl to Father on December 28, 2011.

Appellants filed a motion to stay the transfer and to reconsider on December 9, 2011, which the family court denied on December 14, 2011.[13] Appellants then filed a notice of appeal in the court of appeals on December 20, 2011, along with a petition for a writ of supersedeas. Judge Aphrodite Konduras temporarily granted the petition for a writ of supersedeas pending the filing of a return by Father. On December 30, 2011, Judge Konduras issued an order lifting the temporary grant of supersedeas and denying the petition for a writ of supersedeas. On December 31, 2011, Appellants transferred Baby Girl to Father, and Father and his parents immediately traveled with Baby Girl back to Oklahoma.

This Court certified the appeal pursuant to Rule 204(b), SCACR. In addition to briefs filed by the parties, the American Academy of Adoption Attorneys, the Catawba Indian Nation, the North American Council on Adoptable Children, the Child Welfare League of America, the National Indian Child Welfare Association, and the Association on American Indian Affairs have filed briefs as amici curiae.

## ISSUES

I. Whether Appellants properly transferred Baby Girl to South Carolina.

---

13. The GAL also filed a motion to reconsider, which was denied.

II. Whether the ICWA defers to state law in determining whether an unwed father is a "parent" as defined by the ICWA.

III. Whether Appellants proved grounds to terminate Father's parental rights under the ICWA.

STANDARD OF REVIEW

When reviewing a decision by the family court, an appellate court has the authority to find the facts in accordance with its own view of the preponderance of the evidence. *Lewis v. Lewis*, 392 S.C. 381, 384, 709 S.E.2d 650, 651 (2011). "However, this broad scope of review does not require this Court to disregard the findings of the family court" judge who is in a superior position to make credibility determinations, nor does it relieve an appellant of demonstrating the error of the family court. *Id.* at 384, 389, 709 S.E.2d at 651, 654.

LAW/ANALYSIS

I. The ICWA

This case is unique in that it involves an Indian child,[14] and thus, any child custody proceeding must be decided within the parameters of the ICWA, 25 U.S.C. § 1901–1963 (1978).

The ICWA "was the product of rising concern in the mid–1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989). The evidence presented to Congress during the 1974 hearings revealed that "25 to 35% of all Indian children had been separated from their families and placed in adoptive families, foster care, or institutions." *Id.* (citation omitted). Moreover, "[t]he adoption rate of Indian children was eight times that of non-Indian children" and "[a]pproxi-

---

14. An "Indian Child" is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

mately 90% of the Indian placements were in non-Indian homes." *Id.* at 33, 109 S.Ct. 1597 (citation omitted). At the Congressional hearings, a Tribal Chief described the primary reason for such removal as follows:

One of the most serious failings of the present system is that Indian children are removed from the custody of their natural parents by nontribal government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing. Many of the individuals who decide the fate of our children are at best ignorant of our cultural values, and at worst contemptful of the Indian way and convinced that removal, usually to a non-Indian household or institution, can only benefit an Indian child.

*Id.* at 34, 35, 109 S.Ct. 1597 (citation and footnote omitted).[15]

Although Congress primarily sought to prevent the involuntary removal of American Indian or Alaska Native Indian children from their families and tribal communities and placement of these children into both foster care and adoptive placements, *see* 25 U.S.C. §§ 1912(e)–(f), 1915(b), it is clear that Congress was likewise concerned with the voluntary adoptions of Indian children. *See* 25 U.S.C. § 1915(a) ("In *any* adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." (emphasis added)).

Aside from the avoidance of culturally inappropriate removal of Indian children, Congress intended the ICWA to pre-

---

**15.** For example, non-Indian state child welfare workers often mischaracterize the dynamics of the Indian extended family:

An Indian child may have scores of, perhaps more than a hundred, relatives who are counted as close, responsible members of the family. Many social workers, untutored in the ways of Indian family life or assuming them to be socially irresponsible, consider leaving the child with persons outside the nuclear family as neglect and thus as grounds for terminating parental rights.

H.R.Rep. No. 1386, at 22 (1978) reprinted in 1978 U.S.C.C.A.N. 7530, 7533. At trial, the Cherokee Nation presented expert testimony that the involvement of extended family members in child-rearing is culturally unique to Cherokee Indians.

serve tribal sovereignty with respect to its familial affairs. In *Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 32, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989), the only United States Supreme Court case addressing the ICWA, the Court determined that the Choctaw Indian Tribe had the sole authority to determine the adoptive placement of twin babies under the ICWA. In that case, both Indian parents desired to have their twin babies adopted by non-Indian parents. *Id.* In construing section 1911(a) of the ICWA, the Supreme Court stated:

> [n]or can the result be any different simply because the twins were "voluntarily surrendered" by their mother. Tribal jurisdiction under § 1911(a) was not meant to be defeated by the actions of individual members of the tribe, for Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians. The numerous prerogatives accorded the tribes through the ICWA's substantive provisions ... must, accordingly, be seen as a means of protecting not only the interests of individual Indian children and families, but also of the tribes themselves.

*Id.* at 49, 109 S.Ct. 1597 (internal citations and footnote omitted).[16]

---

**16.** While the present case does not involve section 1911(a), which grants tribes exclusive jurisdiction to determine placement of Indian children who are either domiciled on a reservation or a ward of the tribe, the ICWA "lays out a dual jurisdictional scheme." *Holyfield,* 490 U.S. at 36, 109 S.Ct. 1597. Therefore, in cases of children not domiciled on the reservation, section 1911(b), as noted in the *Holyfield* decision,

> creates concurrent but presumptively tribal jurisdiction in the case of children not domiciled on the reservation: on petition of either parent or the tribe, state court proceedings for foster care placement or termination of parental rights are to be transferred to the tribal court, except in cases of "good cause," objection by either parent, or declination of jurisdiction by the tribal court.

*Id.* In cases of concurrent jurisdiction between states and tribes, the ICWA "set[s] procedural and substantive standards for those child custody proceedings that do take place in state court." *Id.* Thus, the clear message of *Holyfield,* even though construing section 1911(a), still rings true in this child custody proceeding: the ICWA safeguards the tribe's role in child custody proceedings affecting its children and

Therefore, exercising its power under the Indian Commerce Clause of the United States Constitution, U.S. Const. art. 1, § 8, Congress passed the ICWA making, *inter alia*, these specific findings:

(3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;

(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.

25 U.S.C. § 1901.

Additionally, Congress declared:

[I]t is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

*Id.* § 1902.[17]

Because the ICWA establishes "minimum Federal standards for the removal of Indian children from their families"

---

protects a tribe's strong interest in retaining its children within the tribe. *Id.* at 37, 109 S.Ct. 1597.

**17.** Given that its policy conflicts with the express purpose of the ICWA, we take this opportunity to reject the "Existing Indian Family" doctrine (the "EIF"). *See* Note, *The Indian Childs Welfare Act of 1978: Does it*

and applies to any child custody proceeding involving an Indian child, *see* 25 U.S.C. §§ 1902, 1903, 1911, it is through this lens that we are constrained to decide the present controversy.

## II. *Transfer of Baby Girl to South Carolina*

In its rendering of the facts of the case, the final order of the family court stated that if it were not for the misinformation provided to the Cherokee Nation about the birth father during the process of securing the ICPC, "[Appellants] [would not have] received permission to remove the child from Oklahoma and transport the child to their home state of South Carolina just days after her birth." This statement was neither a finding of fact nor a conclusion of law, but rather was part of the factual background provided in the order. Nevertheless, on appeal Respondents argue that South Carolina courts lack jurisdiction to determine the custody issues. In response, Appellants argue that they properly transferred Baby Girl to South Carolina, and if not, the improper transfer was forgivable or understandable. More specifically, Appellants contend the ICPC form, which did not accurately represent Baby Girl's Indian heritage, should not be construed against them because the ICPC does not protect the rights of birth parents but is designed to ensure the child's safe transfer across state lines. Thus, Appellants maintain, they have satisfied the requirements of the ICPC by providing Baby Girl with a safe and loving home. Furthermore, while Appellants do not dispute that the Cherokee Nation was never informed of Baby Girl's status as an Indian child, Appellants argue that

*Apply to the Adoption of an Illegitimate Indian Child?*, 38 Cath. U. L. Rev., 511, 534 (1989) ("In light of the legislative history of the ICWA, the existing Indian family theory is thus contrary to the intent of Congress." (footnotes omitted)). The EIF is a judicially created exception to the application of the ICWA. *See In the Matter of the Adoption of Baby Boy L.*, 231 Kan. 199, 643 P.2d 168, 175 (1982), *overruled by In the Matter of A.J.S.*, 288 Kan. 429, 204 P.3d 543 (2009) (holding the purpose of the ICWA "was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother"). In so holding, we join the majority of our sister states who have rejected the EIF or have since abandoned the exception. *See In the Matter of A.J.S.*, 204 P.3d at 548–49 (listing the states that have rejected the EIF).

the misspelling of Father's name was an obvious mistake, which they subsequently corrected by amending their pleadings to allege Father is a Cherokee Indian.

Appellants correctly identify the purpose of the ICPC. *See Doe v. Baby Girl*, 376 S.C. 267, 284, 657 S.E.2d 455, 464 (2008) ("[W]e note the ICPC was designed to ensure that placements for children across state lines are safe; it was not designed to protect the rights of the birth parents. Certainly, there was no evidence that Baby Girl's placement with appellants had become unsafe in any way." (internal citation omitted)). However, we think Appellants' argument mischaracterizes the family court's statement. The family court did not find that Appellants violated the ICPC by *unsafely* transferring Baby Girl across state lines. Rather, Appellants' mistake when researching Father's tribal membership coupled with the subsequent omission on the ICPC form, meant that the Cherokee Nation was not properly alerted to Baby Girl's status as an Indian child; and therefore, the tribe's right to participate in Baby Girl's placement was never triggered before Appellants removed Baby Girl from Oklahoma.

While the evidence establishes Baby Girl would not be in South Carolina had the Cherokee Nation been properly noticed of her status as an Indian child, we agree with Appellants that the propriety of Baby Girl's transfer to South Carolina was litigated in the Oklahoma action when the Oklahoma court issued an order dismissing the case on jurisdictional grounds. Appellants correctly point out that in Father's Response to Appellants' Motion to Dismiss, he argued that the ICPC request form "would not have been processed by Michael Nomura of Heritage Family Services without giving notice to the Cherokee Nation had Defendant not withheld the fact that the baby was part American Indian on the form." After considering this and other arguments, the Oklahoma court issued an order dismissing the action on jurisdictional grounds, and neither Father nor the Cherokee Nation appealed that order. Therefore, because no appeal was taken from the dismissal of the action, that decision remains the law of the case. *See Ulmer v. Ulmer*, 369 S.C. 486, 490, 632 S.E.2d 858, 861 (2006) ("A portion of a judgment that is not appealed presents no issue for determination by the reviewing court and constitutes, rightly or wrongly, the law of the case.").

Because the Oklahoma court declined to exercise jurisdiction in this case, it is now incumbent on this Court to resolve the myriad issues concerning Baby Girl's final placement.

### III. Father's Status as a "Parent" under the ICWA

Appellants claim Father does not have standing to invoke the protection of the ICWA because Father does not meet the ICWA's statutory definition of "parent" found in section 1903(9).[18] We disagree.

The family court found the ICWA was applicable, in that the Cherokee Nation is an "Indian Tribe," Baby Girl is an "Indian Child," and Father is a "parent" as prescribed in the ICWA. *See* 25 U.S.C. § 1903(4), (8)–(9).

The ICWA defines "parent" as

any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child, including adoptions under tribal law or custom. *It does not include the unwed father where paternity has not been acknowledged or established.*

*Id.* § 1903(9) (emphasis added).

Appellants argue that unwed fathers must show more than "mere biology" to invoke the protections of the ICWA. The ICWA does not explicitly set forth a procedure for an unwed father to acknowledge or establish paternity; thus, Appellants argue that the ICWA defers to state law on this point. Relying on section 63–9–310(A)(5) of the South Carolina Code,[19] Appellants contend that because Father neither lived with Mother for a continuous period of six months before the

---

**18.** Appellants also urge this Court to conclude that the ICWA does not apply if we conclude Father is not a "parent" as defined by the ICWA. However, the ICWA's applicability stems from Baby Girl's status as an Indian child under section 1903(4). *See* Note, *The Indian Child Welfare Act of 1978: Does it Apply to the Adoption of an Illegitimate Indian Child?*, *supra* note 17, at 540 ("Congress clearly intends that the only prerequisite to the operation of the ICWA be the involvement of an Indian Child in a child custody proceeding."). Thus, the ICWA applies because Baby Girl is an Indian child, and whether or not this Court finds Father a "parent" has no bearing on the ICWA's applicability.

**19.** That section provides that an unwed father must consent to an adoption taking place within six months of a child's birth only if:

(a) the father openly lived with the child or the child's mother for a continuous period of six months immediately preceding the place-

child's birth, nor contributed to her pregnancy-related expenses, Father does not qualify as a "parent" under the ICWA.

■ In making the determination that Father was a "parent" under the ICWA, the family court focused on the distinction between the requirements for an unwed father to consent to an adoption under state law versus the requirements for an unwed father to establish paternity under the ICWA, and found the "ICWA extends *greater* rights to the unwed Indian father" than state law. (emphasis added). The family court's finding and Appellants' argument collapse the notions of paternity and consent. However, the family court ultimately concluded that Father met the ICWA's definition of "parent" by both acknowledging his paternity through the pursuit of court proceedings as soon as he realized Baby Girl had been placed up for adoption and establishing his paternity through DNA testing. We agree with the family court that, by its plain terms, this is all that is required under the ICWA. Therefore, Father is a "parent" as defined by the ICWA.

### IV    Termination of Parental Rights

■ Because we find Father is a "parent"[20] for purposes of the application of the ICWA, we now turn to whether Father's parental rights should be terminated. While the ICWA incorporates state law termination grounds, it also clearly mandates state courts consider heightened federal requirements to terminate parental rights as to ICWA parents.[21]

---

ment of the child for adoption, and the father openly held himself out to be the father of the child during the six months period; or
(b) the father paid a fair and reasonable sum, based on the father's financial ability, for the support of the child or for expenses incurred in connection with the mother's pregnancy or with the birth of the child, including, but not limited to, medical, hospital, and nursing expenses.

S.C.Code Ann. § 63–9–310(A)(5) (2010). Under state law, Father's consent to the adoption would not have been required.

20. We note that Father is not afforded protection under the ICWA merely because he is an *Indian* parent. The ICWA also provides protection to non-Indian parents, so long as they are a parent of an "Indian Child" as defined by section 1903(4).

21. We agree with the dissent that the ICWA does not operate to "oust" the states' jurisdiction to make custody determinations affecting Indian

## A.  Voluntary Termination

While Father's consent would not have been required under South Carolina law, *see* S.C.Code Ann. § 63–9–310(A)(5), for a parent to voluntarily relinquish his or her parental rights under the ICWA, his or her

> consent shall not be valid unless executed in writing and recorded before a judge of a court of competent jurisdiction and accompanied by the presiding judge's certificate that the terms and consequences of the consent were fully explained in detail and were fully understood by the parent or Indian custodian.  The court shall also certify that either the parent or Indian custodian fully understood the explanation in English or that it was interpreted into a language

children.  *See Holyfield,* 490 U.S. at 58, 109 S.Ct. 1597 (citation omitted).  However, in cases where state courts are considering the placement of an Indian child, the ICWA sets forth important procedural and substantive provisions that state courts *must* follow.  *Id.* at 36, 109 S.Ct. 1597.  While state termination grounds play a part in custody proceedings under the ICWA, we believe, unlike the dissent, that state law cannot operate to frustrate the clear purposes of the ICWA, as "Congress perceived the States and their courts as partly responsible for the problem [the ICWA] intended to correct."  *Id.* at 44–45, 109 S.Ct. 1597.  In fact, to achieve its desired goal of placing Baby Girl with Appellants, the dissent utilizes reasoning expressly rejected by the *Holyfield* court in finding that a state court could not employ state abandonment principles to sidestep the ICWA's clear mandates in order to sanction an Indian mother's attempt to avoid the ICWA's domiciliary provisions to facilitate an adoption by white parents.  *See id.* at 52–53, 109 S.Ct. 1597 (stating this insertion of state abandonment principles "conflicts with and undermines the operative scheme established by subsections [1911(a)] and [1913(a)] to deal with children of domiciliaries of the reservation and weakens considerably the tribe's ability to assert its interest in its children.  This relationship between Indian tribes and Indian children domiciled on the reservation finds no parallel in other ethnic cultures found in the United States.  It is a relationship that many non-Indians find difficult to understand and that non-Indian courts are slow to recognize.  It is precisely in recognition of this relationship, however, that the ICWA designates the tribal court as the exclusive forum for the determination of custody and adoption matters for reservation-domiciled Indian children, *and the preferred forum for nondomiciliary Indian children.  [State] abandonment law cannot be used to frustrate the federal legislative judgment expressed in the ICWA that the interests of the tribe in custodial decisions made with respect to Indian children are as entitled to respect as the interests of the parents."* (quoting *In re Adoption of Halloway,* 732 P.2d 962, 969–970 (1986))).

that the parent or Indian custodian understood. Any consent given prior to, or within ten days after, birth of the Indian child shall not be valid.

25 U.S.C. § 1913(a). Moreover, a parent may withdraw his or her consent "for any reason at any time prior to the entry of a final decree of termination or adoption, as the case may be, and the child shall be returned to the parent." *Id.* § 1913(c).

██ It is undisputed that the only consent document Father ever signed was a one-page "Acceptance of Service" stating he was not contesting the adoption, which was purportedly presented for Father's signature as a prerequisite to the service of a summons and complaint. Thus, Appellants did not follow the clear procedural directives of section 1913(a) in obtaining Father's consent. Moreover, even if this "consent" was valid under the statute, then Father's subsequent legal campaign to obtain custody of Baby Girl has rendered any such consent withdrawn. Therefore, neither Father's signature on the "Acceptance of Service" document, nor his stated intentions to relinquish his rights, were effectual forms of voluntary consent under the ICWA.

### B. Involuntary Termination

Thus, we may only grant Appellants' adoption decree with respect to Father in the absence of his voluntary consent if Appellants can establish grounds for involuntarily terminating Father's parental rights under state law *and* the ICWA.

Under the ICWA, in addition to any state law grounds for termination, Appellants must "satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d). Moreover,

No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence *beyond a reasonable doubt,* including testimony of qualified expert witnesses, that the continued custody of the

child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

*Id.* § 1912(f) (emphasis added).

### 1. *Active Remedial Measures*

■ To effect termination under the ICWA, the parties seeking termination "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d).

Appellants admit that the provision has not been satisfied; however, they seek to avoid the remedial measures requirement by claiming that any efforts to rehabilitate Father would be futile. We find Appellants' futility argument insufficient to override the clear mandate of section 1912(d) under these facts.                                                    ＇

■ Even assuming the dissent is correct in finding that Father did not want custody of Baby Girl and did not desire to act as a parent to her, straightforward application of the language of section 1912(d) requires that remedial services be offered to address any parenting issues to prevent the breakup of the Indian family—for example, by attempting to stimulate Father's desire to be a parent or to provide necessary education regarding the role of a parent.[22] In this case, far from offering such services, Appellants—perhaps understandably, given the emotionally wrenching circumstances—have actively sought to prevent Father from obtaining custody of Baby Girl since she was four months old. Father, despite some early indications of possible lack of interest in Baby Girl, not only reversed course at an early point but has maintained that course despite this active opposition. Therefore, a finding on these facts that the remedial measures mandated by

---

**22.** The dissent rightly points out that, in most termination cases, the *state* initiates remedial or rehabilitative efforts after *removing* a child from parental custody. However, the dissent acknowledges that "such services may also be offered to parents proactively to prevent a child's removal in the first instance." The ICWA does not distinguish removal situations from adoptive placements. Thus, had the tribe been properly noticed of the adoption from the outset, it would have been the tribe's prerogative to take remedial measures to reunify the Indian family.

the ICWA may be waived would be an unwarranted substitution of this Court's preferences for the clear dictates of statutory law.[23]

## 2. Likelihood of Serious Emotional or Physical Damage

Section 1912(f) requires a qualified expert to provide evidence satisfying this Court beyond a reasonable doubt "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." The family court applied a clear and convincing standard of review, pursuant to *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), even

---

**23.** We note that even under South Carolina law, we do not terminate parental rights merely because a parent is not a perfect parent. *See Hooper v. Rockwell*, 334 S.C. 281, 296, 513 S.E.2d 358, 366 (1999). Thus, only where "reunification is not possible or appropriate" may a party move to terminate the parent's rights by proving a basis for termination by clear and convincing evidence. *Id.; see also Richland Cnty. Dep't of Soc. Servs. v. Earles*, 330 S.C. 24, 32, 496 S.E.2d 864, 868 (1998) (citing *Greenville Cnty. Dep't of Soc. Servs. v. Bowes*, 313 S.C. 188, 437 S.E.2d 107 (1993)). Our cases demonstrate that when a parent consciously refuses to support, visit, or otherwise make a suitable environment for their child, termination is appropriate, but even in extreme cases, we seek to rehabilitate the parent either by ordering them to pay support, addressing any substance abuse issues, or instituting a treatment or placement plan. *See S.C. Dep't of Soc. Servs. v. M.R.C.L.*, 393 S.C. 387, 390–95, 712 S.E.2d 452, 454–57 (2011) (terminating parental rights as to parents who tested positive for crack cocaine, failed to complete drug and alcohol testing, and refused to comply with court ordered child support); *Hooper*, 334 S.C. at 296–301, 513 S.E.2d at 366–69 (terminating parental rights based on mother's severe abuse and neglect of her child, refusal to satisfy court ordered support obligations, and failure to comply with at least twelve treatment plans designed to remedy the conditions which led to her child's removal); *Earles*, 330 S.C. at 32–34, 496 S.E.2d at 868–70 (terminating parental rights after mother's home could not be made safe within twelve months due to mother's physical and sexual abuse of her two children over the course of four years); *S.C. Dep't of Soc. Servs. v. Broome*, 307 S.C. 48, 48, 413 S.E.2d 835, 835 (1992) (terminating parental rights after mother failed to support child by making only three court ordered child support payments over a one-year period, attending only thirty-five of ninety-four visits scheduled with the child over a four-year period, and failing to visit the child at all for a period of five months); *Dep't of Soc. Servs. v. Phillips*, 365 S.C. 572, 580, 618 S.E.2d 922, 926 (Ct.App.2005) (terminating parental rights after children were exposed to sexual behaviors between mother and father and

though the instant case deals with termination of parental rights under the ICWA. While the family court misinterpreted *Santosky*,[24] considering it found Appellants failed to meet even the lower burden, we agree that Appellants have not satisfied their burden of proving that Father's custody of Baby Girl would result in serious emotional or physical harm to her beyond a reasonable doubt.

The family court admitted the testimony of Dr. Bart Saylor as Appellants' expert witness to demonstrate the likelihood of damage to Baby Girl if removed from Appellants' custody. Dr. Saylor, a licensed clinical psychologist and designated forensic psychologist, conducted a bonding evaluation with Appellants and Baby Girl, but had no contact with Father. Dr. Saylor only considered the effect of severing Baby Girl's bond with Appellants and did not review any information about Father's capacity to form a loving relationship with Baby Girl. Although Dr. Saylor admitted he did not have specific training in Cherokee child rearing practices, he did not believe knowledge of Indian culture was necessary to evaluate the bonding between Baby Girl and Appellants. Dr. Saylor testified that Appellants and Baby Girl had a very strong bond, and therefore,

> I believe that at this point removal from the one and only parents, the secure, the bonded relationship, the one and only that she has with these parents at this age would be very traumatic, would be very disruptive. It could produce depression, anxiety, it could cause disruption in her capacity to form relationships at a later age. It would be extremely stressful to her. It would be taking away everything that she had come to know and count on for her comfort and

---

mother failed to remedy her drug addiction problem during the year the children were removed from the home).

**24.** In *Santosky*, the Supreme Court held that the *minimum* burden of proof allowable in a state-initiated termination of parental rights proceedings was "clear and convincing evidence." 455 U.S. at 769, 102 S.Ct. 1388. Any lesser standard would deprive a parent of due process under the law. *Id.* While the *Santosky* court mentioned that states might find the "beyond a reasonable doubt" standard utilized in the ICWA an "unreasonable barrier to state efforts to free permanently neglected children for adoption," the thrust of the *Santosky* decision was to create a minimum, not a maximum, burden of proof in termination of parental rights proceedings.

security and replace it with something that would be completely unfamiliar and strange to her.

Dr. Saylor confirmed that he believed beyond a reasonable doubt that Baby Girl's removal from Appellants would cause serious emotional harm. However, Dr. Saylor agreed that even though a child may have bonded successfully one time, a child can bond again. Finally, he could not say what long-term harm would result from Baby Girl's removal.

Father's expert, Tiffany Dunaway, a Child Welfare Specialist with the Cherokee Nation who has worked with between ten and fifteen transitioned children the same age as Baby Girl, conducted a home study on Father's family while Father was stationed on active duty in Iraq. Dunaway reported that the family home was clean, safe, and appropriate and that there were many acres of land surrounding the home for outdoor play. Based on her interaction with Father's parents, Dunaway opined, "this child will thrive, I don't have any doubt. I know we can't predict the future, but I think that she will be safe.... She'll know who she is and where she came from. She'll be very loved." Under cross-examination, Dunaway admitted that some transitioned children have difficulties, especially older children, but testified that these children have thrived overall. Dunaway admitted that she had never met Baby Girl, nor had she witnessed Father interact with a child the same age as Baby Girl. Dunaway's opinion about the ability of the child to thrive was based on anecdotal experience, and she could not produce any studies to show that transitioned children thrive in the long-term.[25]

In its final order, the family court noted that Dr. Saylor could not render an opinion about the long-term effects of severing the bond between Appellants and Baby Girl, although he testified that in the short-term it would be very traumatic.

---

**25.** The dissent finds Dunaway's opinion "lacks credibility" as to whether Baby Girl would suffer harm if removed from Appellants' custody, citing testimony in which Appellants' counsel challenged Dunaway to provide statistics that children placed in tribal homes have not suffered serious harm, rather than basing her assertions on her personal experience as a case worker. We disagree that this exchange reflects negatively on Dunaway's credibility, as she testified to her personal experience in transitioning children. In any event, it was Appellants' burden to establish a likelihood of serious emotional or physical harm beyond a reasonable doubt if Baby Girl were placed with Father.

The family court found persuasive the testimony that Father was a good father who enjoyed a close relationship with his other daughter and Dunaway's testimony that children around Baby Girl's age tended to thrive when reunited with their Indian parents. Therefore, the family court concluded that Appellants did not prove that "the child will suffer physical or emotional damage if returned to the custody of her biological father," and as a result, "the ICWA prohibits termination of his parental rights."

Appellants argue that section 1912(f) does not require a child to suffer long-term harm. Appellants urge this Court to find severe emotional harm likely based solely on the expected harm of severing Baby Girl's bond from the only parents she knows.

Initially, we note that the plain language of section 1912(d) requires a showing that the transferee parent's prospective legal and physical custody is likely to result in serious damage to the Indian child, not that the Indian child's *removal* from the custody of the adoptive parents will likely result in emotional damage, which in this case Appellants' expert admits is likely to be temporary.[26]

Absent any evidence to the contrary, we hold that Appellants' reliance on bonding, without more, cannot satisfy their high burden of proving that Father's custody of Baby Girl would result in serious emotional or physical damage to her. While we are conscious that any separation will cause some degree of pain, we can only conclude from the evidence presented at trial that Father desires to be a parent to Baby

---

26. Even in cases of the *voluntary* relinquishment of parental rights, the parent has the ability under the ICWA to renege on his or her consent *"for any reason at any time"* before the entry of the final decree of termination or adoption. *See* 25 U.S.C. § 1913(c) (emphasis added). Thus, the ICWA gives conclusive preference to parental custody over custodial stability. Indeed, the dissent's dependence on Father's perceived lack of interest in or support for Baby Girl during the pregnancy and first four months of her life as a basis for termination his rights as a parent is not a valid consideration under the ICWA for this same reason. Because the ICWA permits a parent to revoke voluntary consent up until the final adoption decree for any reason at all, whatever Father's deficit in expressing interest in Baby Girl, it clearly falls short of consent to termination, and even then, his rights would not be prejudiced until a final decree.

Girl, and that he and his family have created a safe, loving, and appropriate home for her. Furthermore, Father instituted child custody proceedings when Baby Girl was four months old. *See Rick P. v. State, OCS*, 109 P.3d 950, 958 (Alaska 2005) (footnote omitted) ("Our cases indicate that a parent's willingness to resume parental duties does not 'remedy' abandonment if this change of heart comes too late for the parent to bond with the child during the critical early phase of the child's life."). Because Father intervened at this early point and most of the bonding occurred during the course of this litigation, it should not be a factor that weighs against Father. *See Holyfield*, 490 U.S. at 53–54, 109 S.Ct. 1597 (1989) ("We are not unaware that over three years have passed since the twin babies were born and placed in the [adoptive] home, and that a court deciding their fate today is not writing on a blank slate in the same way it would have [three years ago]. Three years' development of family ties cannot be undone, and a separation at this point would doubtless cause considerable pain. . . . Had the mandate of the ICWA been followed [three years ago], of course, much potential anguish might have been avoided, and in any case the law cannot be applied so as automatically to 'reward those who obtain custody, whether lawfully or otherwise, and maintain it during any ensuing (and protracted) litigation.'" (citation omitted)). Thus, the bonding that occurred during litigation, without more, cannot form the basis for terminating Father's parental rights.

### 3. State Statutory Grounds for Termination

Because we have found that Appellants have not met their burden of proof to establish termination under the ICWA, we need not address the grounds for termination elucidated in section 63–7–2570 of the South Carolina Code. *See Wilkinson ex rel. Wilkinson v. Palmetto State Transp. Co.*, 382 S.C. 295, 307, 676 S.E.2d 700, 706 (2009) (appellate court need not discuss remaining issues when determination of prior issue is dispositive).

### 4. Best Interests of the Child

South Carolina courts have a long history of determining custody disputes based on the "best interests of the child." *See Hooper v. Rockwell*, 334 S.C. 281, 295, 513 S.E.2d 358, 366

(1999) ("This Court long has tried to decide all matters involving the custody or care of children in 'light of the fundamental principle that the controlling consideration is the best interests of the child.'" (quoting *In Re Doran*, 129 S.C. 26, 31, 123 S.E. 501, 503 (1924))). This important history is not *replaced* by the ICWA's mandate. *See In re Welfare of L.N.B.–L.*, 157 Wash.App. 215, 237 P.3d 944, 965 (2010) ("ICWA's applicability does not mean that ICWA replaces state law with regard to a child's best interests.") Instead, "[w]ell-established principles for deciding custody matters should further [the ICWA's] goals." *Id.* (quoting *In re Mahaney*, 146 Wash.2d 878, 51 P.3d 776, 785 (2002)).

■■■■■ Where an Indian child's best interests are at stake, our inquiry into that child's best interests must also account for his or her status as an Indian, and therefore, we must also inquire into whether the placement is in the best interests of the *Indian child*. *See* 25 U.S.C. § 1902 ("The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs."). In making this determination, the child's relationship with his or her tribe is an important consideration, as the ICWA is "based on the fundamental assumption that it is in the Indian child's best interest that its relationship to the tribe be protected." *Holyfield*, 490 U.S. at 50 n. 24, 109 S.Ct. 1597 (quoting *In re Appeal in Pima Cnty. Juvenile Action No. S–903*, 130 Ariz. 202, 635 P.2d 187, 189 (App. 1981)).[27] Thus, Baby Girl, as an Indian child, has a strong

___

**27.** While the *tribe* ultimately decided to return the *Holyfield* children to the adoptive parents, the dissent fails to account for the marked difference between the facts of the *Holyfield* custody dispute and those of the present controversy, and the actual basis for the tribe's decision: the children had been in the care of the adoptive parents for four years; they did not understand the Choctaw language, which was the predominant language spoken in most Choctaw homes; and no adoptive tribal home was waiting for the children, so that interim placement in foster care would have been necessary. *See* Solangel Maldonado, *Race,*

interest in retaining ties to her cultural heritage. *See id.* at 49–50, 109 S.Ct. 1597 ("In addition, it is clear that Congress's concern over the placement of Indian children in non-Indian homes was based in part on evidence of the detrimental impact on the children themselves of such placements outside their culture.").[28]

The family court order stated, "[w]hen parental rights and the best interests of the child are in conflict, the best interests of the child must prevail. However, in this case, I find no

---

*Culture, and Adoption: Lessons from Mississippi Band of Choctaw Indians v. Holyfield,* 17 Colum. J. Gender & L. 1, 17–18 (2008). Moreover, the tribal court ordered that the children maintain contact with their Choctaw extended family and tribe, and the placement was within the same state. *Id.* at 18; *Holyfield,* 490 U.S. at 40, 109 S.Ct. 1597. Thus, the children's and tribe's respective interests in maintaining cultural ties were still protected.

**28.** The Record establishes that Father's family has a deeply embedded relationship with the Cherokee Nation. For example, not only does the Record indicate that Father and his family are proud of their heritage and membership in the Wolf Clan, the home study performed on Father's parents states the following:

[Father's father] is Cherokee Indian. He grew up knowing he was Cherokee and being proud of who he was. [Father's parents] ... prepare the following traditional foods in their home: grape dumplings, buckskin bread, Indian cornbread, Indian tacos, wild onions, fry bread, polk salad and deer meat. [Father's mother] state[d] she cooks these foods in her home on a regular basis and all of her children have eaten these items.

[Father's parents] attend the Cherokee Holiday in Tahlequah, Oklahoma[,] when they can and participate in eating traditional foods, viewing the arts and crafts and watching the traditional games. [Father's father] participates in voting in the Cherokee elections[,].... took part in learning about the Cherokee culture when his children were in high school by learning to make Indian crafts and learning to play the drum[, and].... is sometimes seen at the Nowata Indian Health Clinic but receives the majority of his health care from the Veterans hospital. He claims his family is from the Wolf Clan, and he has been to as well as participated in stomp dances.

[H]is family had Indian land which was located in Pryor, Oklahoma and Cayuga, Oklahoma. He claims to have very traditional ties with his extended family and considers geneology [sic] a hobby by researching his Cherokee culture. [Father's parents] have many Native American items in their home. Decorative Native American pieces are scattered throughout their home in nearly every room.

Thus, the Record demonstrates that Father and his family are well-positioned to introduce Baby Girl to her Indian heritage.

conflict between the two." [29]   Likewise, we cannot say that Baby Girl's best interests are not served by the grant of custody to Father, as Appellants have not presented evidence that Baby Girl would not be safe, loved, and cared for if raised by Father and his family.   Moreover, in transferring custody to Father and his family, Baby Girl's familial and tribal ties may be established and maintained in furtherance of the clear purpose of the ICWA, which is to preserve American Indian culture by retaining its children within the tribe.   *See Holyfield,* 490 U.S. at 37, 109 S.Ct. 1597.

## C.   Preferential Placement

Furthermore, even if we were to terminate Father's rights, section 1915(a) of the ICWA establishes a hierarchy of preferences for the adoptive placement of an Indian child.[30]   *See* 25 U.S.C.1915(a).   That section provides: "[i]n any adoptive placement of an Indian child under State law, a preference shall be given, *in the absence of good cause to the contrary,* to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." (emphasis added).   While not binding, the Bureau of Indian Affairs Guidelines concerning good cause state that courts may look to the "request of the biological parents or the child when the child is of sufficient age," the "extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness," and the "unavailability of suitable families for placement after a diligent search has been completed for families meeting the

29.   The dissent states: "It is apparent that the decision of the family court judge was influenced to some extent by the erroneous legal conclusion that ICWA eclipses the family court's obligation to determine what would be in the child's best interests."   We do not read the family court's order to be based on that erroneous assumption.   Plainly, the family court determined that there was no conflict between Father's best interests and Baby Girl's best interests.   *See* S.C.Code Ann. § 63–9–20 (stating that in adoption proceedings "when the interests of a child and an adult are in conflict, the conflict must be resolved in favor of the child.").

30.   *Holyfield* describes this provision as "[t]he most important substantive requirement imposed on state courts" under the ICWA towards creating a federal policy that an Indian child should remain with his or her tribe whenever possible.   *Holyfield,* 490 U.S. at 36, 37, 109 S.Ct. 1597 (citation omitted).

preference criteria" when deciding to deviate from the stated preferences. 44 Fed. Reg. 67584, 67954–95 (1979). The party seeking to deviate from the preferences bears the burden of demonstrating that good cause exists. *Id.*

■ From the outset, rather than seek to place Baby Girl within a statutorily preferred home, Mother sought placement in a non-Indian home.[31] In our view, the ensuing bond that has formed in the wake of this wrongful placement cannot be relied on by Appellants and the dissent to deviate from the ICWA's placement preferences.

■ While the best interests of the child standard is always a guiding consideration when placing a child, any attempt to utilize our state's best interests of the child standard to eclipse the ICWA's statutory preferences ignores the fact that the statutory placement preferences and the Indian child's best interests are not mutually exclusive considerations. Instead, the ICWA presumes that placement within its ambit is in the Indian child's best interests. *See In re C.H.*, 299 Mont. 62, 997 P.2d 776, 784 (2000) ("[T]he best interests of the child . . . is an improper test to use in ICWA cases *because the*

---

31. The biological parents' placement preference is not the guiding consideration under the ICWA. Rather, the ICWA assigns great weight to tribal preference when placing Indian children. *See Holyfield*, 490 U.S. at 52–53, 109 S.Ct. 1597 ("The protection of this tribal interest is at the core of the ICWA, which recognizes that the tribe has an interest in the child which is distinct from but on a parity with the interest of the parents. This relationship between Indian tribes and Indian children domiciled on the reservation finds no parallel in other ethnic cultures found in the United States. It is a relationship that many non-Indians find difficult to understand and that non-Indian courts are slow to recognize. It is precisely in recognition of this relationship, however, that the ICWA designates the tribal court as the exclusive forum for the determination of custody and adoption matters for reservation-domiciled Indian children, and the preferred forum for nondomiciliary Indian children. [State] abandonment law cannot be used to frustrate the federal legislative judgment expressed in the ICWA that the interests of the tribe in custodial decisions made with respect to Indian children are as entitled to respect as the interests of the parents." (quoting *In re Adoption of Halloway*, 732 P.2d 962, 969–970 (1986))); Roger A. Tellinghuisan, *The Indian Child Welfare Act of 1978: A Practical Guide With [Limited] Commentary*, 34 S.D. L. Rev. 660, 666 (1989) ("*Holyfield* also carries the clear message that [the ICWA] would be read liberally, perhaps creatively, to protect the rights of the tribe even against the clearly expressed wishes of the parents . . . .").

*ICWA expresses the presumption that it is in an Indian child's best interests to be placed in accordance with statutory preferences.* To allow emotional bonding—a normal and desirable outcome when, as here, a child lives with a foster family for several years—to constitute an 'extraordinary' emotional need [comprising good cause to deviate from the preferences] would essentially negate the ICWA presumption." (emphasis added)). Therefore, "the unfettered exercise of [state] discretion poses a real danger that the ICWA preferences will be overridden upon the slightest evidence favoring alternative placement." Barbara Ann Atwood, *Flashpoints under the Indian Child Welfare Act: Toward a New Understanding of State Court Resistance*, 51 Emory L.J. 587, 645 (2002). Thus, the bonding that has occurred between Appellants and Baby Girl has not satisfied this Court that custody with Father is against Baby Girl's best interests. For this reason, under these facts, we cannot say that bonding, standing alone, should form the basis for deviation from the statutory placement preferences.

## CONCLUSION

We do not take lightly the grave interests at stake in this case. However, we are constrained by the law and convinced by the facts that the transfer of custody to Father was required under the law. Adoptive Couple are ideal parents who have exhibited the ability to provide a loving family environment for Baby Girl. Thus, it is with a heavy heart that we affirm the family court order.

Because this case involves an Indian child, the ICWA applies and confers conclusive custodial preference to the Indian parent. All of the rest of our determinations flow from this reality. While we have the highest respect for the deeply felt opinions expressed by the dissent, we simply see this case as one in which the dictates of federal Indian law supersede state law where the adoption and custody of an Indian child is at issue. Father did not consent to Baby Girl's adoption, and we cannot say beyond a reasonable doubt that custody by him would result in serious emotional or physical harm to Baby Girl. Thus, under the federal standard we cannot terminate Father's parental rights. For these reasons, we affirm the

family court's denial of the adoption decree and transfer of custody to Father.

**AFFIRMED.**

PLEICONES and BEATTY, JJ., concur. KITTREDGE, J., dissenting in a separate opinion in which HEARN, J., concurs. HEARN, J., dissenting in a separate opinion in which KITTREDGE, J., concurs.

Justice KITTREDGE.

I dissent. I would reverse and remand for the entry of an order terminating the father's parental rights and approving the adoption. I would further order the immediate return of the minor child to the adoptive parents.

Today the Court decides the fate of a child without regard to *her* best interests and welfare. I disagree that Congress intended the Indian Child Welfare Act [32] (ICWA or Act) to be applied in derogation of the child's best interests and welfare. *See In re Welfare of L.N.B.–L.*, 157 Wash.App. 215, 237 P.3d 944, 965 (2010) ("ICWA's applicability does not mean that ICWA replaces state law with regard to a child's best interests"); *In re Mahaney*, 146 Wash.2d 878, 51 P.3d 776, 785 (2002) (observing that ICWA's applicability "should not signal to state courts that state law is replaced by the act's mandate"). ICWA envisioned a symbiotic relationship between the additional protections of the Act and well-established state law principles for deciding custody matters in accordance with the best interests of the child. The simple fact that a child is an "Indian child" is not dispositive of the placement question. In my judgment, Congress intended ICWA-controlled cases to be decided based on a preference for placement with an Indian family, not an irrebuttable presumption mandating an Indian family placement. Even in *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989), the only case in which the United States Supreme Court has addressed ICWA, the tribal court, on

---

**32.** "ICWA establishes Federal minimum standards for the removal of Indian children from their homes and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture. . . ." 25 U.S.C. § 1902.

remand, ordered child placement with the non-Indian adoptive parent. *See* Solangel Maldonado, *Race, Culture, and Adoption: Lessons from Mississippi Band of Choctaw Indians v. Holyfield,* 17 Colum. J. Gender & L. 1, 17–18 (2008).

In my judgment, under our *de novo* review, the unique facts of this case manifestly overcome the statutory placement preference and compel placement of this child with the adoptive couple. The facts of a case cannot be ignored. With great respect for the majority, I believe it has recast the facts to portray Father in an undeserved favorable light, thus creating the illusion that Father's interests are in harmony with the best interests of the child. The reality is Father purposely abandoned this child and no amount of revisionist history can change that truth. As for the protracted procedural history, the Court blames the birth mother and the adoptive couple—everyone except the Father, whose vanishing act triggered the adoption in the first instance. As I view the evidence, the interests of Father and Respondents are directly contrary to the best interests of this child. I believe the law, including ICWA, supports my view that the best interests of the child must prevail.

## I.

## STANDARD OF REVIEW

This Court's standard of review in an appeal from the family court is *de novo.* S.C. Const. art. V, § 5 ("The Court shall have appellate jurisdiction . . . in cases of equity, and in such appeals they shall review the findings of fact as well as the law. . . ."); *Lewis v. Lewis,* 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011). As such, "the appellate court has jurisdiction to find facts in accordance with its view of the preponderance of the evidence." *Lewis,* 392 S.C. at 384, 709 S.E.2d at 651. Although we generally defer to findings of fact by the family court due to its ability to assess the demeanor and credibility of witnesses, our standard of review does not require any deference. Having carefully reviewed the voluminous record, with great respect for the able family court judge, I am firmly persuaded that the family court judge erred in her factual findings, especially in the application of the facts to the law. Determining the proper interpretation of a statute is a ques-

tion of law for our plenary review.  *Town of Summerville v. City of N. Charleston*, 378 S.C. 107, 110, 662 S.E.2d 40, 41 (2008);  *see also E.D.M. v. T.A.M.*, 307 S.C. 471, 473, 415 S.E.2d 812, 814 (1992) (noting the appellate court has authority to correct errors of law in appeals from family court orders).

## II.

## FACTS

At the center of this controversy is a child ("Baby Girl") born to unwed parents on September 15, 2009.  Before her birth, the biological parents ("Mother" and "Father") were engaged to be married but were not living together.  In addition to Baby Girl, Father has a child from a previous relationship who was six years old at the time of the engagement.  Father pays support for his other child through a deduction from his military pay;  however, those payments began only after that child's mother brought an action against him in family court because he accrued an estimated $11,000 child support arrearage.[33]

When Mother and Father were dating, Father was serving in the military and stationed in Fort Sill, Oklahoma, approximately four hours away from his hometown of Bartlesville, Oklahoma, where his parents and Mother lived with her two other children from a previous relationship.  Father visited Mother in Bartlesville during his fourteen-day break in December 2008, and although he was permitted to leave the military base on weekends, he seldom made the four-hour drive from Fort Sill to Bartlesville.[34]

---

**33.** There are allegations that Father has another child;  however he denies paternity and does not support that child.

**34.** Father explained, "Being four hours away I was able to come home on the weekends, but I didn't make the right amount of money, you know, to be sufficient enough for me to come home, you know, whenever I wanted to."  The record reveals Father's annual salary was $20,227 in 2009 and $23,697 in 2010.  Because of Father's military service, he was not required to pay income taxes when in active service.  Additionally, his housing and food expenses were covered by the military, and Father admitted virtually all of his salary was disposable income.  The only recurring expenses Father mentioned were $20–25

In January 2009, Mother told Father they were expecting a child.[35] Before her first prenatal doctor's appointment, Mother asked Father for financial assistance. Although he acknowledged paternity from the outset, Father refused to help financially unless he and Mother were married. At trial, Father was asked, "But she had to marry you before you felt you'd be responsible as a father?" He answered, "Correct." After her prenatal appointment, Mother told Father the baby's due date was in September 2009.

In the months thereafter, despite the Court's attempt to recast the facts in a light more favorable to Father, he wanted nothing to do with the pregnancy and related responsibilities. The couple's relationship became "extremely distant" and by June 2009, they were no longer speaking to one another.[36]

Throughout Mother's pregnancy, Father never offered to pay any of her medical or living expenses or accompany her to any doctor's visits, even though he admitted he was capable of doing so. According to Father, he would have given Mother support, but he "never got[ ] anything from the state of Oklahoma for child support." Eventually, with Father abandoning parental responsibilities, Mother broke off the relationship. Shortly thereafter, Mother sent Father a text message inquiring whether he wanted to support her and their child or relinquish his parental rights. Father sent a return text message to Mother expressly indicating his desire to give up his parental rights.

---

per week for cigarettes and going to bars "drinking with [his military] buddies, joking and having a good time."

**35.** There is conflicting evidence as to Father's reaction to this news. Father testified he was "very happy" to learn they were expecting a child. However, Mother testified Father "didn't really have a reaction" and "every time [she] would bring it up, he really didn't say a whole lot." I find Mother's testimony more credible, as Father's lack of interest in his child and refusal to provide Mother any support strongly corroborates her testimony as to Father's reaction to learning of the pregnancy.

**36.** According to the Guardian *ad Litem's* report, "Phone records obtained by the Guardian confirm many texts coming into [Father's] telephone from the Birth Mother's telephone number through the end of May," despite Father's claim that Mother severed contact and would not respond to his repeated attempts to reach her.

Father later claimed he would not have "given up" his parental rights had he known Mother planned to place the baby for adoption. However, during Father's cross-examination the following exchange took place:

Q. But you were prepared to sign all your rights and responsibilities away to this child just so as long as the mother was taking care of the child?

A. That's correct.

Q. And you would not be responsible in any way for the child support or anything else as far as the child's concerned?

A. Correct.

Q. That's correct? Is that conducive to being a father?

A. I don't believe so.

Mother was already struggling financially as a single mother of two children, and she knew it would be even more difficult to provide for a third child without help from Father. Mother testified she "wanted [her] little girl to have a chance," and she believed an adoption plan would be in the best interests of Baby Girl. Due to Father's stated disinterest in supporting or rearing the child, coupled with Mother's belief that Father's verbal and written expressions effectively relinquished his parental rights, she did not inform Father that she planned for the child to be adopted.

In June 2009, Mother was introduced to Adoptive Couple ("Appellants") after she contacted an adoption agency in Oklahoma. Appellants reside in Charleston, South Carolina, and have been married for six years. The couple received infertility treatment for years and underwent seven unsuccessful in vitro fertilization attempts before deciding to adopt. Mother testified that she considered other families residing in Oklahoma, but she ultimately selected Appellants as an adoptive couple because they had values similar to her own and could provide Baby Girl a stable and loving home. In the weeks leading up to Baby Girl's birth, Appellants spoke to Mother weekly and traveled to Oklahoma to visit Mother in August 2009. Appellants helped support Mother during the last few months of her pregnancy and shortly after Baby Girl's birth.

Before she gave birth, Mother informed the adoption agency she had Cherokee heritage and that she believed Father

was an enrolled member of Cherokee Nation. Mother provided her attorney with Father's correctly spelled name and location and what she believed to be his date of birth.[37] Mother's attorney forwarded this information to Cherokee Nation in a letter dated August 21, 2009. The letter also stated Father was believed to be an enrolled member and inquired whether the tribe would consider Baby Girl to be an "Indian Child" under ICWA. However, in the letter, Father's first name "Dusten" was misspelled "Dustin," and his date of birth was not accurate. Based on that incorrect information, Cherokee Nation replied in a letter dated September 3, 2009, that the unborn baby could not be traced to tribal records and therefore would not be considered an "Indian Child." However, Cherokee Nation's letter also stated, "This determination is based on the above listed information exactly as provided by you. Any incorrect or omitted family documentation could invalidate this determination." Mother testified she told her attorney the letter from Cherokee Nation was wrong and that Father was an enrolled member of the tribe; however, Mother admitted she did not know Father's correct birth date.[38]

Appellants were present for Baby Girl's birth on September 15, 2009. Appellants were in the delivery room when Mother

---

**37.** Mother testified she knew Father's birthday was in October and that he was older than she was, so Father's year of birth was sometime before 1982.

**38.** A trial, Cherokee Nation presented testimony of one of its employees as an expert in Cherokee Indian culture and Cherokee child-rearing. The expert testified that Cherokee names are often passed down and many members have the same name. According to the expert, the tribe uses "birth date, name, *something to get us somewhere close* to see if a person is [an] enrolled [member]."

At oral argument, counsel indicated Cherokee Nation has eight members with the first name "Dustin" or "Dusten" with the same last name as Father. It is unclear how many of those eight members have the same middle name as Father or live in Fort Sill, Oklahoma; however, when asked how many were born in the same month, counsel replied that she did not know, but that she "guessed" Father was the only one. Counsel further explained, "[Cherokee Nation] receive[s] possibly thousands of inquiries a year. Everyone in the country claims to be Cherokee. We can't track down every letter we get." Notwithstanding this assertion by counsel, the record includes correspondence from Cherokee Nation demonstrating that the tribe indeed responds to *some* inquiries with a follow-up request for additional information.

gave birth to Baby Girl. Adoptive Father cut the umbilical cord.

Father, however, did not appear at the hospital or attempt to contact Mother while she was in the hospital.[39] The following day, Mother signed forms relinquishing her parental rights and consenting to the adoption of Baby Girl. Baby Girl was placed with Appellants shortly after her release from the hospital. Eight days after her birth, Appellants returned to South Carolina with Baby Girl.[40]

Although he was aware of the anticipated due date, Father made no attempt to contact Mother during the months after she gave birth to ask about Baby Girl, to request visitation, or to offer any gifts or financial support. According to Father's mother, she called Mother several times shortly after Baby Girl's birth to let her know the family had some money and some gifts for the baby, but Mother did not return her phone calls. Mother denied receiving calls or visits from any of Father's family members.

Appellants initiated adoption proceedings in Charleston, South Carolina, on September 18, 2009.

Because Father had evaded all parental responsibilities, he did not learn that Baby Girl was placed for adoption until he was served with a copy of Appellants' adoption complaint on January 6, 2010, a fact that the majority somehow believes inures to Father's benefit.[41] Father signed an acceptance of

---

39. Father admitted he knew the expected due date and that there was only one hospital available for the birth. However, there was no evidence Father attempted to be present.

40. A prerequisite to Appellants removing the child from Oklahoma was receiving consent from the State of Oklahoma pursuant to the Oklahoma Interstate Compact on Placement of Children (ICPC). Mother provided the documentation; however, the documentation reflected the child's race as "Hispanic" instead of "Native American." Notably, this document was completed on September 21, 2009, after receiving a letter dated September 3, 2009, from Cherokee Nation indicating Baby Girl was not an Indian child and ICWA was not applicable. After the child was discharged from the hospital, Appellants stayed in Oklahoma for approximately eight days until they received ICPC approval.

41. The complaint was served on Father just days before he was deployed to Iraq for approximately twelve months. Father returned from Iraq on December 26, 2010.

service stating that he was the father of Baby Girl, that he was not contesting the adoption, and that he waived the thirty-day waiting period and notice of hearing.

On January 11, 2010, Father requested a stay of the South Carolina adoption proceedings under the Servicemember's Civil Relief Act and three days later filed a summons and complaint in an Oklahoma district court to establish paternity, child custody, and support of the child. Father's complaint initially alleged that "[n]either parent nor the children [sic] have [sic] Native American blood. Therefore the Federal Indian Child Welfare Act ... do[es] not apply." The complaint was amended on April 19, 2010, to allege "[b]oth the father and the child have Native American blood. Therefore the Federal Indian Child Welfare Act ... do[es] apply." The Oklahoma complaint named Appellants and Mother as defendants. Father departed for Iraq on January 18, 2010, with his father acting as power of attorney while he was away. On June 28, 2010, the Oklahoma action was dismissed on jurisdictional grounds, as South Carolina was the child's home state.[42]

At some point during the pendency of the Oklahoma action, Cherokee Nation identified Father as a registered member and determined that the child was an Indian Child, as defined by ICWA.[43] On March 30, 2010, Appellants amended their South Carolina pleadings to acknowledge Father's member-

---

42. Respondents challenge South Carolina's jurisdiction to hear this case, which is an improper effort to further litigate Father's unsuccessful Oklahoma action. Yet this Court accepts Respondents' invitation to weigh in on the Oklahoma action and castigate Appellants. No appeal was taken from the dismissal of the Oklahoma action, rendering the Oklahoma dismissal the law of the case. See Ulmer v. Ulmer, 369 S.C. 486, 632 S.E.2d 858 (2006) (noting an unappealed ruling becomes law of the case and precludes further consideration of the issue on appeal). Before acknowledging this issue is not before us, the majority's superfluous discussion attributes nefarious motives to Appellants and refers to Baby Girl's transfer to South Carolina as improper. Again, Father, who ran away from parental responsibilities, avoids any responsibility. I do not understand how an unwed birth father who willfully abandons his child escapes even the slightest blame.

43. An Indian child means "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

ship in Cherokee Nation. On April 7, 2010, Cherokee Nation filed a Notice of Intervention in the South Carolina action.

The case was tried in September of 2011. The interest of Baby Girl was represented by a Guardian *ad Litem*, who recommended that Father's rights be terminated and the adoption be approved.[44] On November 25, 2011, a final order was issued, in which the family court found ICWA applied and further that Father's parental rights should not be terminated under South Carolina law. The family court denied Appellants' petition for adoption and transferred custody of Baby Girl to Father.

## III.

## LAW/ANALYSIS

Based upon my *de novo* review of the record, the family court's findings are affected by several reversible errors. Specifically, the family court erred in finding Appellants failed to meet their burden of proving grounds for termination of Father's parental rights. As discussed in detail below, it was error to conclude that Father's failures to support and visit were not willful under state law. Father knowingly abandoned his parental responsibilities in every respect, including his willful failure to contribute any support until token efforts were made well after this adoption proceeding was underway. Yet, state law is not the only relevant consideration; rather, state law must be considered along with the federal mandates superimposed by ICWA.

## A.

## Overview of ICWA

ICWA establishes "minimum Federal standards for the removal of Indian children from their families," and applies to

---

44. I note the parties agreed that the family court would not consider the portions of the Guardian *ad Litem's* report going to the ultimate issues to be decided—specifically, the aspects of the report concerning the child's best interests and custody recommendation. Likewise, I do not consider the Guardian *ad Litem's* ultimate recommendations and emphasize that my findings of Baby Girl's best interests are reached separately and independently.

any child custody proceeding involving an Indian child. *See* 25 U.S.C. §§ 1902, 1903, 1911. Congress enacted ICWA in response to the "rising concern in the mid–1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Holyfield*, 490 U.S. at 32, 109 S.Ct. 1597. The legislative history of ICWA indicates Congress was concerned with " 'the wholesale removal of Indian children from their homes, the most tragic aspect of Indian life today.' " *Id.* (quoting Indian Child Welfare Program, Hearings before the Subcommittee on Indian Affairs of the Senate Committee on Interior and Insular Affairs, 93d Cong., 2d Sess., 3 (statement of William Byler)). As one Tribal Chief testified, "Indian children are removed from the custody of their natural parents by nontribal government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing. Many of the individuals who decide the fate of our children are at best ignorant of our cultural values, and at worst contemptful of the Indian way and convinced that removal, usually to a non-Indian household or institution, can only benefit an Indian child." *Id.* at 34, 109 S.Ct. 1597 (quoting Hearings on S. 1214 before the Subcommittee on Indian Affairs and Public Lands of the House Committee on Interior and Insular Affairs, 95th Cong., 2d Sess., 191–92 (1978) (statement of Calvin Isaac, Tribal Chief of the Mississippi Band of Choctaw Indians and representative of the National Tribal Chairmen's Association)).

Thus, ICWA was intended to preserve tribal sovereignty and avoid the culturally inappropriate removal of Indian children based on the tendency of "many social workers, ignorant of Indian cultural values and social norms ... [to] discover neglect or abandonment where none exists." H.R.Rep. No. 1386, at 22 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7533.[45]

---

45. The House Report describes a particular aspect of Indian culture that is frequently misunderstood:

[T]he dynamics of Indian extended families are largely misunderstood. An Indian child may have scores of, perhaps more than a hundred, relatives who are counted as close, responsible members of the family. Many social workers, untutored in the ways of Indian

Accordingly, the express purpose of ICWA is "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families." 25 U.S.C. § 1902.

However, almost forty years later, in struggling with the human reality of implementing ICWA, courts frequently face competing tensions concerning an individual child's personal and cultural identity. "The grand narrative underlying the Act, while born of a grim history of governmental destruction of Indian tribes, families, and culture, sometimes has little direct correlation with the actual circumstances of individual Indian children before state court judges." Barbara Ann Atwood, *Flashpoints Under the Indian Child Welfare Act: Toward a New Understanding of State Court Resistance,* 51 Emory L.J. 587, 596 (2002). "In any child welfare case, it is essential that the decisionmaker be able to exercise discretion in arriving at a disposition that is most likely to protect the future welfare of the unique child." *Id.* I would adopt this well-reasoned approach and reject the majority's approach of applying ICWA in a rigid, formulaic manner without regard to the facts of the particular case and the best interests of the Indian child.[46] I, unlike the majority, construe ICWA as allowing appropriate consideration of compelling circum-

---

family life or assuming them to be socially irresponsible, consider leaving the child with persons outside the nuclear family as neglect and thus as grounds for terminating parental rights.

H.R.Rep. No. 1386, at 22 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7533. At trial, Cherokee Nation presented expert testimony that the involvement of extended family members in child-rearing is an aspect that is culturally unique to Cherokee Indians.

**46.** Were the issue before this Court, I would reject the existing Indian family doctrine based on ICWA's clear statutory language in accordance with the modern trend. *See, e.g., In re Adoption of Baby Boy L.,* 231 Kan. 199, 643 P.2d 168, 175 (1982) ("It was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother."), *overruled by In re A.J.S.,* 288 Kan. 429, 204 P.3d 543, 549 (2009) (abandoning existing Indian family doctrine based on a finding it was "at odds with the clear language of ICWA"). There is scant evidence that Father ever established significant social or cultural ties with Cherokee Nation. I give the absence of such evidence no weight. The majority gives great weight to paternal grandparents' ties with the Cherokee Nation.

stances in a particular case which bear on the individual child's physical, psychological, and social welfare.

## B.

### Applicability of ICWA

The family court found ICWA was applicable. Specifically, the family court found Cherokee Nation is an "Indian Tribe," Baby Girl is an "Indian Child," and Father is a "parent," as defined by ICWA. *See* 25 U.S.C. §§ 1903(4), (8)–(9).

Appellants do not challenge the family court's findings that Cherokee Nation is an "Indian Tribe" and Baby Girl is an "Indian Child." However, Appellants argue the family court erred in finding Father satisfies the ICWA definition of a "parent." ICWA defines a "parent" as:

any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child, including adoptions under tribal law or customs. *It does not include the unwed father where paternity has not been acknowledged or established.*

25 U.S.C. § 1903(9) (emphasis added).

Appellants argue the text, legislative history, and policy underlying ICWA demonstrate that unwed fathers must show more than "mere biology" to invoke the protections afforded to a parent under ICWA. ICWA does not expressly establish how an unwed father must acknowledge or establish paternity. According to Appellants, courts should look to the particular state's statutory prescription for when a father's paternity has been acknowledged.

Looking to South Carolina law, Father's consent to the adoption would not be required because he neither lived with Mother for a continuous period of six months before birth, nor contributed to her pregnancy-related expenses. As explained more fully below, I would reverse the family court in this regard.[47]

---

47. The Court could affirm the family court without upholding what I believe to be an egregiously erroneous determination that Father's rights would not be terminated under state law. By sidestepping the clear error of the family court, that is precisely what the Court has done. The indisputable fact is that Father provided no support to

Specifically, in South Carolina, where a child is placed with the prospective adoptive parents within six months of birth, an unwed father's consent is required only if:

(a) the father openly lived with the child or the child's mother for a continuous period of six months immediately preceding the placement of the child for adoption, and the father openly held himself out to be the father of the child during the six months period; or

(b) the father paid a fair and reasonable sum, based on the father's financial ability, for the support of the child or for expenses incurred in connection with the mother's pregnancy or with the birth of the child, including, but not limited to, medical, hospital, and nursing expenses.

S.C.Code Ann. § 63–9–310(A)(5) (Supp.2011); *see also Reeves*, 392 S.C. at 153, 708 S.E.2d at 784 ("It is not enough that the father simply have a desire to raise the child; he must act on that interest and make the material contributions to the child and the mother during her pregnancy required of a father-to-be.").

Because Father abandoned his child and would not be recognized as a putative father under South Carolina law, Appellants claim Father cannot be considered a parent under ICWA and his consent to the adoption is not required. Although I agree with Appellants that Father abandoned Baby

Mother during the pregnancy. Parental rights have been terminated under South Carolina law where the biological parent did far more to grasp the opportunity of parenthood than Father. *See Roe v. Reeves*, 392 S.C. 143, 708 S.E.2d 778 (2011) (finding father did not undertake a sufficient effort to make the sacrifices fatherhood demands where he bought pregnant mother sweatpants and t-shirt and offered to give mother $100, even though he attempted to visit mother in the hospital and maintain contact with mother after birth); *Doe v. Roe*, 369 S.C. 351, 631 S.E.2d 317 (Ct.App.2006) (finding father's contributions to pregnant mother failed to meet general minimum standards of timely grasping the opportunity to assume full responsibility for his child where father contributed approximately $50, cigarettes, a pillow, and a few trips to fast food restaurants); *cf. Abernathy v. Baby Boy*, 313 S.C. 27, 437 S.E.2d 25 (1993) (finding father demonstrated willingness to develop a full custodial relationship with his child where he attempted to provide monetary support to mother during pregnancy, endeavored to keep apprised of her progress during the pregnancy, and appeared at the hospital and offered to pay medical expenses incurred from the birth).

Girl and that his rights would be terminated under state law without further inquiry, I nonetheless reject Appellants' contention that such a finding under state law precludes the application of ICWA to this case.

Appellants conflate the issues of consent under state law and the definition of "parent" under ICWA. The issues of paternity and whether one's consent is required in an adoption proceeding are separate questions. It is beyond dispute that Father has acknowledged *biological paternity* from the time Mother first informed him that she was pregnant. The fact that Father, from the beginning, ran from parental responsibilities cannot be used to challenge the issue of paternity. Moreover, Father admitted paternity in his pleadings in both the South Carolina and Oklahoma actions, and DNA testing conclusively established that he is the child's biological father. *Cf. In re Adoption of a Child of Indian Heritage,* 111 N.J. 155, 543 A.2d 925 (1988) (finding putative father not an ICWA parent where father never attempted to enforce his paternal rights, never commenced a proceeding to claim such rights, and failed to acknowledge or establish paternity prior to the entry of the final judgment of adoption). I concur with the family court's finding that Father meets the definition of parent under ICWA.

However, even if Father had not acknowledged paternity here, ICWA nonetheless would apply simply because Baby Girl is an Indian child. The Act's protections do not stem only from a parent's status as such. Rather, ICWA's protections were specifically designed to safeguard the interests and welfare of Indian *children*—not just parental rights.

Because ICWA applies and Father does not consent to the adoption, Appellants are required to prove grounds for terminating Father's parental rights and adoptive placement in accordance with ICWA and state law.

## C.

### Termination of Parental Rights

The majority avoids the family court's findings with respect to termination of Father's parental rights under state law. The family court held Appellants failed to prove by clear and

convincing evidence the existence of any grounds to terminate Father's parental rights. Specifically, as concerns the state law considerations, the family court found Father's failure to visit and failure to support Baby Girl were not willful. Additionally, as concerns ICWA considerations, the family court found Appellants failed to meet their burden of proving that continued custody by Father was likely to result in serious emotional or physical harm to Baby Girl.

Appellants argue they demonstrated that Father's failure to visit and failure to support was willful and that termination of Father's parental rights was in the best interests of Baby Girl. I agree.

Unlike the majority, my view is predicated upon the guiding principle that "[t]he welfare and best interests of the child are paramount in custody disputes." *Woodall v. Woodall*, 322 S.C. 7, 11, 471 S.E.2d 154, 157 (1996); *see also S.C. Dep't of Soc. Servs. v. Cochran*, 364 S.C. 621, 614 S.E.2d 642 (2005) (stating that the best interests of the child are paramount to that of the parent in cases involving termination of parental rights). Nothing evinces any Congressional intent to disregard this cardinal rule in the context of ICWA; rather, Congress has expressly declared it is the policy of the United States to protect the best interests of Indian children. *See* 25 U.S.C. § 1902 ("[I]t is the policy of this Nation to protect the best interests of Indian children...."). Thus, "ICWA's applicability does not mean that ICWA *replaces* state law with regard to a child's best interests." *L.N.B.–L.*, 237 P.3d at 965 (emphasis added) (finding continuation of father's and mother's parental relationship would likely result in serious emotional damage to their children and thus, termination of parental rights was in children's best interests); *see also In re Dependency of A.A.*, 105 Wash.App. 604, 20 P.3d 492, 495–96 (2001) ("Regardless of the culture from which the parents come, when a termination proceeding is initiated in a Washington court, the best interests of the children at issue are paramount.... [T]he dominant consideration in a termination of parental rights is the moral, intellectual and material welfare of the child."); *In re Interest of C.W.*, 239 Neb. 817, 479 N.W.2d 105, 114 (1992) (stating "ICWA does not change the cardinal rule that the best interests of the child are paramount") (internal quotation omitted).

Therefore, ICWA's applicability "should not signal to state courts that state law is replaced by the act's mandate." *Mahaney*, 51 P.3d at 785. Rather, ICWA envisioned a symbiotic relationship between the additional protections of the Act and well-established state law principles for deciding custody matters in accordance with the best interests of the child. *See Holyfield*, 490 U.S. at 58, 109 S.Ct. 1597 (noting "Congress did not intend to 'oust the States of their traditional jurisdiction over Indian children falling within their geographic limits'" through enacting ICWA) (quoting H.R.Rep. No. 95–1386, at 19 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7541). It is with these principles in mind that we should determine whether Appellants met their burden of showing that Father's parental rights should be terminated under both state law and federal law.[48]

---

**48.** The majority accuses me of ignoring the "most salient feature of the *Holyfield* decision, which is that the Supreme Court deferred to the *tribe* to decide what was in the best interest of those Indian children." I fully appreciate that the Supreme Court ultimately deferred to the Choctaw Tribe in that instance; however, unlike the majority, I recognize that such deference was afforded because the Indian children in *Holyfield* were required to be considered as domiciled on the reservation, and thus, the tribal courts were vested with *exclusive* jurisdiction to enter a decree of adoption pursuant to section 1911(a) of ICWA. *See Holyfield*, 490 U.S. at 53, 109 S.Ct. 1597. In my view, the majority construes this narrow holding in *Holyfield* to require unwavering deference to the tribe in *all* matters—not just those relating to the power of tribal courts to adjudicate child custody proceedings vis-avis state courts where the Indian child is domiciled on the reservation. Indeed, the majority conflates the issues of venue, tribal sovereign jurisdiction, and the controlling feature of substantive law regarding the protection of an Indian child's best interests to justify its rigid view of ICWA's exclusive dominance in every realm. However, because the application of section 1911(a) is not presently before this Court, I find that *Holyfield's* protection of tribal sovereignty, although properly zealous in that instance, does not mandate absolute deference to the Cherokee Nation's custody recommendations here.

Moreover, I fail to see how my position would disregard any of the interests ICWA affords to the Tribe. *See id.* at 49, 109 S.Ct. 1597 ("The numerous prerogatives accorded the tribes through the ICWA's substantive provisions, e.g., §§ 1911(a) (exclusive jurisdiction over reservation domiciliaries), 1911(b) (presumptive jurisdiction over nondomiciliaries), 1911(c) (right of intervention), 1912(a) (notice), 1914 (right to petition for invalidation of state-court action), 1915(c) (right to alter presumptive placement priorities applicable to state-court actions), 1915(e) (right to obtain records), 1919 (authority to conclude agreements with States), must, accordingly, be seen as a means of protecting

## 1.

## Grounds for Termination

The family court found Father's failure to visit and support Baby Girl did not show a settled purpose to forego his parental duties. These findings, especially as to Father's failure to support, are manifestly contrary to the evidence.

Regarding visitation, the family court found the child's removal from Oklahoma, Father's subsequent deployment to Iraq, and the contested nature of the custody lawsuit hindered Father's ability to visit Baby Girl. Regarding support, the family court found that Father was a full-time member of the military, was capable of providing support, but failed to offer any type of meaningful support to Mother or his child prior to being served with the adoption lawsuit. Nonetheless, the family court concluded Father's failure to contribute any support was not willful. In this regard, the family court found significant that Appellants never sought support from Father, he was not under any court order to pay support, and that he began paying child support when Baby Girl was sixteen months old.[49] While section 63-7-2570 allows for consideration of "requests for support by the custodian and the ability of the parent to provide support[,]" I would not give Father a reprieve on his failure to pay support simply because Appellants did not seek support from someone who had repeatedly expressed disinterest in the child.[50] Father's parental rights under South Carolina would have been terminated before Baby Girl was placed with Appellants. Moreover, I would consider this factor alongside well-settled law (discussed be-

---

not only the interests of individual Indian children and families, but also of the tribes themselves."). None of the Tribe's rights established by ICWA and enumerated in *Holyfield* are implicated, much less disregarded, here. Accordingly, I cannot understand the majority's continued emphasis on the primacy of tribal sovereignty as determinative of the outcome of this action.

**49.** Beginning in February 2011, Father has intermittently sent checks to Appellants' attorney for the benefit of Baby Girl. According to the record, Father remitted seven checks totaling $1,500. The most recent payment was dated July 7, 2011.

**50.** This is particularly so in light of the evidence at trial indicating Father refused to provide Mother with pre-birth financial assistance.

low) that a parent most certainly cannot excuse abandonment of parental responsibilities by claiming no one asked or demanded he or she act like a parent. *See,* e.g., *Reeves,* 392 S.C. at 152–53, 708 S.E.2d at 783 (noting that if the mother wants the father to stay away, he must respect her wishes but be sure that his support does not remain equally distant) (citing *In re Adoption of M.D.K.,* 30 Kan.App.2d 1176, 58 P.3d 745, 750–51 (2002) (Beier, J., concurring)).

The United States Supreme Court has issued a series of cases holding that the Constitution affords protection to an unwed father where the father has grasped the opportunity to be a parent; mere biology is not enough. *See, e.g., Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (holding failure to give putative father notice of adoption proceedings did not violate due process where he had never established a substantial relationship with his child).[51] Essentially, "[p]arental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." *Id.* at 260, 103 S.Ct. 2985 (quoting *Caban v. Mohamed,* 441 U.S. 380, 397, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (Stewart, J., dissenting)). Thus, "[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'coming forward to participate in the rearing of his child,' his interest in personal contact with his child acquires substantial protection under the due process clause." *Id.* at 261, 103 S.Ct. 2985 (quoting *Caban,* 441 U.S. at 392, 99 S.Ct. 1760). "[M]ere existence of a biological link does not merit equivalent constitutional protection." *Id.* "If [a natural father] grasps the opportunity" to develop a relationship with his child and "accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development." *Id.* at 262, 99 S.Ct. 1760. "If he fails to do so, the Federal Constitution

---

**51.** *Lehr* was preceded by *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (holding due process was violated by the automatic rejection of an unwed father's custodial relationship without granting the father opportunity to present evidence regarding his fitness as a parent), and *Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (denying constitutional protection to unwed father who had manifested only limited interest in his children).

will not automatically compel a state to listen to his opinion of where the child's best interests lie." *Id.*

In recognition of these principles, South Carolina similarly requires an unwed father's parental rights to be predicated upon some involvement in the child's life. Thus, if an unwed father fails to undertake parental responsibility, as in this case, his parental rights are jeopardized. A family court may terminate parental rights upon clear and convincing evidence of at least one enumerated statutory ground and a finding that termination is in the best interests of the child. *S.C. Dep't of Soc. Servs. v. Headden*, 354 S.C. 602, 608, 582 S.E.2d 419, 423 (2003) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)).

A parent's rights may be terminated if:

(3) The child has lived outside the home of either parent for a period of six months, and during that time the parent has *willfully* failed to visit the child.... The distance of the child's placement from the parent's home must be taken into consideration when determining the ability to visit.

(4) The child has lived outside the home of either parent for a period of six months, and during that time the parent has *willfully* failed to support the child.... The court may consider all relevant circumstances in determining whether or not the parent has willfully failed to support the child, including requests for support by the custodian and the ability of the parent to provide support.

S.C.Code Ann. § 63–7–2570 (Supp.2011) (emphasis added). Willful conduct is that which "evinces a settled purpose to forego parental duties ... because it manifests a conscious indifference to the rights of the child to receive support and consortium from the parent." *S.C. Dep't of Soc. Servs. v. Broome*, 307 S.C. 48, 53, 413 S.E.2d 835, 839 (1992).[52]

---

**52.** Although compliance with the literal requirements of section 63–7–2570 is usually required, there are instances in which a father's inability to undertake specific acts to preserve his parental relationship with his child may be excused, such as where an unwed father timely demonstrates a willingness to develop a relationship with his child but is thwarted from doing so by the refusal of the child's mother to accept his expressions of interest and commitment. *See Abernathy*, 313 S.C. at 32, 437 S.E.2d at 29 (finding an "unwed father is entitled to constitutional protection not only when he meets the literal requirements of

Based on my *de novo* review of the evidence, Father's failure to visit Baby Girl was willful. Father made no meaningful effort to establish a relationship with Baby Girl when there was ample opportunity for him to do so. To the contrary, he avoided any rights and responsibilities to the child. As noted, on repeated occasions, Father expressed his willingness to sign away his parental rights.[53] Moreover, while Father was in Iraq until December 2010, Father failed to request visitation until he was deposed in this case. At the time of his request, Baby Girl was twenty-two months old, and Father had returned from active duty seven months earlier.[54]

I would also find that Father's failure to support Baby Girl was willful. I find the credible evidence shows Mother immediately informed Father of her pregnancy and requested financial assistance, but Father neither offered nor assisted Mother with either the pregnancy or with the medical costs associated with pregnancy and birth. According to Father, he would have paid child support if he had received a court order directing him to do so or if Mother had requested support and agreed to marry him.

section [63-7-2570], but also when he undertakes sufficient prompt and good faith efforts to assume a parental responsibility and to comply with the statute"). Here, the family court properly found Father was not entitled to the protection of the "thwarted father" exception because there is no evidence indicating he attempted to contribute to the support of his child during Mother's pregnancy or after the child's birth.

53. The majority correctly notes that Father's various written and verbal expressions wishing to give up his parental rights were not legally binding. I do not understand why the majority undertakes such a substantial discussion of this issue, for no one has ever contended those expressions were legally binding. I do not equate them with valid legal consent to this adoption. Yet, at least to me, Father's clear expressions speak volumes about the element of willfulness in his abandonment of Baby Girl. Moreover, the relevance of this evidence to the issue of Baby Girl's best interests is self-evident. In my view, the revocability of a parent's consent under section 1913 of ICWA, to which the majority refers, does not render irrelevant a parent's repeated expressions of unwillingness and disinterest in parenting.

54. According to Father, he never sent any cards or letters seeking progress reports on Baby Girl because he was unsure of whether he might be "going against any legal rights or anything like that. I didn't want to break the law."

However, unlike the family court, I find Father's purported willingness to provide support changes nothing. The suggestion that an unwed father's duty to support his child is conditioned on marriage, a formal plea from the mother or official state action is transparently frivolous. Further, Father's claimed willingness to provide support is of no moment for he did not *actually* provide any support and cannot demonstrate any legitimate excuse for failing to do so. As this Court recently stated:

[An unwed father] must provide support regardless of whether his relationship with the mother-to-be continues or ends. He must do this regardless of whether the mother-to-be is willing to have any type of contact with him whatsoever or submit to his emotional or physical control in any way.

He must not be deterred by the mother-to-be's lack of romantic interest in him, even by her outright hostility. If she justifiably or unjustifiably wants him to stay away, he must respect her wishes but be sure that his support does not remain equally distant.

*Reeves*, 392 S.C. at 152–53, 708 S.E.2d at 783 (quoting *In re Adoption of M.D.K.*, 58 P.3d at 750–51).

Further, we are not constrained to consider only Father's recent conduct towards Baby Girl. Rather, the "court is able to look beyond the months immediately preceding the [termination of parental rights] action at the [parent's] *overall* conduct." *Headden*, 354 S.C. at 612–13, 582 S.E.2d at 425. "While a parent's curative conduct after initiation of an action for termination of parental rights may be considered by the court on the issue of intent, it must be considered in light of the timeliness by which it occurred." *Abercrombie v. LaBoon*, 290 S.C. 35, 38, 348 S.E.2d 170, 171–72 (1986). "Rarely would this judicially motivated repentance, standing alone, warrant a finding that an abandonment had been cured." *Id.* at 38, 348 S.E.2d at 172.

Father failed to pay any child support until Baby Girl reached sixteen months of age and did so inconsistently and in an insubstantial amount.[55] As I have previously stated, the

---

55. According to his own testimony, the amount Father has set aside for child support since Baby Girl's birth is roughly equal to the amount he spends on cigarettes in a single year.

eventual payments of child support and isolated request for visitation are untimely, and I find them to be judicially motivated repentance falling short of curative conduct. *See Reeves,* 392 S.C. at 153, 708 S.E.2d at 784 ("[A] father's attempts to assert his parental rights are insufficient to protect his relationship with the minor child 'unless accompanied by a prompt, good-faith effort to assume responsibility for either a financial contribution to the child's welfare or assistance in paying for the birth mother's pregnancy or childbirth expenses.'"); *Doe v. Roe,* 386 S.C. 624, 633, 690 S.E.2d 573, 578 (2010) (acknowledging Father's attempts to provide support and seek visitation when child was nine months old but finding such effort "came too late for it to have any significant import"); *Ex parte Black,* 330 S.C. 431, 435 n. 1, 499 S.E.2d 229, 232 n. 1 (Ct.App.1998) (finding initial attempts to evade parental responsibilities were not cured by later efforts to assume a parental relationship, where efforts arose at the urging of father's family and only after he realized mother had relinquished her parental rights).

I conclude Father has failed to "grasp his opportunity" to develop a relationship with Baby Girl and the record reflects clear and convincing evidence to support the termination of Father's parental rights under subsections (3) and (4) of section 63–7–2570. The family court's findings in this regard are error. I would terminate Father's parental rights under state law, specifically section 63–7–2570(3) and (4).

### 2.

### Best Interests of the Child

It is apparent that the decision of the family court judge was influenced to some extent by the erroneous legal conclusion that ICWA eclipses the family court's obligation to determine what would be in the child's best interests. In light of this error of law and based upon my review of the record, I would hold that it is in Baby Girl's best interests for Father's parental rights to be terminated.

"[T]he welfare of the child and what is in his/her best interest is the primary, paramount and controlling consideration of the court in all child custody controversies." *Davis v. Davis,* 356 S.C. 132, 135, 588 S.E.2d 102, 103–04 (2003). The

Court acknowledges this settled principle but ignores it in application.[56] "The family court must consider the character, fitness, attitude, and inclinations on the part of each parent as they impact the child." *Woodall*, 322 S.C. at 11, 471 S.E.2d at 157. "In addition, psychological, physical, environmental, spiritual, educational, medical, family, emotional, and recreational aspects of the child's life should be considered." *Id.* As I have previously noted, "ICWA's applicability does not mean that ICWA replaces state law with regard to a child's best interests." *In re Welfare of L.N.B.–L.*, 237 P.3d at 965. Moreover ICWA's applicability "should not signal to state courts that state law is replaced by the act's mandate," *In re Mahaney*, 51 P.3d at 785. Therefore, I consider the best interests of Baby Girl in light of the symbiotic relationship between the ICWA and well-established state law principles.

The Guardian *ad Litem* appointed to represent the interests of Baby Girl reported that Adoptive Mother has made her career as a specialist in child development and works from home, which allows interaction with Baby Girl throughout the day. Moreover, the Guardian found Appellants are child-focused and family-oriented, and Baby Girl has thrived in their care. The Guardian conducted a home visit in Oklahoma with Father and paternal grandparents. The Guardian found Father's family "appears to genuinely care for each other" and that it was the family's desire to receive the child into their home. However, the Guardian expressed concerns regarding Father were he to assume a role as primary caregiver. The Guardian testified about her concerns that Father chose to leave active military service without first arranging full-time civilian employment. Further, the Guardian noted Father has not developed a parenting plan that would enable him to provide for his children beyond that which is afforded by his parents.[57]

---

56. The Court notes "that even under South Carolina law, we do not terminate parental rights merely because a parent is not a perfect parent." I agree, as this is simply another example of the majority attributing to me a position I do not take. It is clear to me from the totality of the majority's analysis that its application of ICWA has eviscerated any meaningful consideration of Baby Girl's best interests, despite its lip service to this settled principle.

57. The portions of the report upon which I rely relate only to the Guardian *ad Litem's* factual observations of Father's conduct and

Additionally, consideration of Father's behavior as it relates to the statutory grounds for termination is appropriate for purposes of the best interests determination because his conduct "evinces a settled purpose to forego parental duties." *Headden*, 354 S.C. at 610, 582 S.E.2d at 423 (citation omitted). Although I recognize Father began intermittently paying child support when Baby Girl was sixteen months old, and sought visitation when she was twenty-two months old, consistent with our existing jurisprudence, I find that these actions "came too late." *Id.* at 611, 582 S.E.2d at 423. By the time Father began these efforts to undertake his parental responsibilities, Baby Girl had already developed a substantial bond with Appellants in the first critical months in her life. Baby Girl's overriding interest in stability and continuity of care must remain in the forefront of this analysis.

In addition to the evidence which supports the statutory grounds for willful failure to visit and support, I also note Father's parental history with his other minor daughter, which reflects a disregard to fulfill parental obligations. The mother of his first child was forced to take court action after Father had amassed a child support arrearage of approximately $11,000. Given the totality of the evidence, placement with Father is not in Baby Girl's best interests. Father's established abandonment of parental responsibilities signifies "that he is consciously indifferent to the rights—and emotional needs—of his infant daughter...." *Doe v. Roe,* 386 S.C. 624, 633, 690 S.E.2d 573, 578 (2010).

In contrast, Appellants have provided Baby Girl a loving, nurturing, and stable home. The evidence of their parental fitness is overwhelming. State law is clear that it is the child's interests which shall prevail. *See* S.C.Code Ann. § 63–7–2570. Accordingly, I conclude placement with Appellants would serve the best interests of Baby Girl.

### 3.

### Heightened Protections of ICWA

Were the termination of Father's parental rights determined solely under state law, there would be no further

---

concerns about his parenting abilities. Those portions are unrelated to any disparity in education and wealth between Father's family and Appellants.

inquiry. However, through ICWA, Congress has specifically afforded heightened protections in a termination of parental rights action. I discuss each of these protections in turn.

### a.

### Emotional Harm to Child

ICWA prohibits the termination of parental rights "in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). The beyond-a-reasonable-doubt standard is different than the clear-and-convincing burden of proof required under state law. Thus, in an Indian child custody proceeding to which ICWA applies, a dual burden of proof must be met before a parent's rights may be terminated: the court must find beyond a reasonable doubt that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child, and the court must also find that clear and convincing evidence supports termination under the applicable state statutory ground. *Accord In re Elliott,* 218 Mich. App. 196, 554 N.W.2d 32 (1996) (finding in a child custody proceeding involving an Indian child, a dual burden of proof must be met); *In re Bluebird,* 105 N.C.App. 42, 411 S.E.2d 820, 823 (1992) (finding "a dual burden of proof is created in which the state provisions and federal provisions must be satisfied separately"); *In re D.S.P.,* 166 Wis.2d 464, 480 N.W.2d 234 (1992) (finding the goals of ICWA and goals of state law are properly harmonized through requiring a dual burden of proof).

The family court found Appellants failed to prove that Father's custody of Baby Girl was likely to result in serious emotional or physical harm to the child. Noting Appellants' expert did not interview Father and had never before conducted a bonding evaluation on an Indian child, the family court gave little weight to his expert testimony. The family court further reasoned that the testimony was entitled to little weight because Appellants' expert considered only the damage resulting from Baby Girl's removal from Appellants' care—not

the harm caused by placement with Father. The family court relied heavily on the testimony of an employee of Cherokee Nation, who testified as to Cherokee Nation's position regarding termination of Father's parental rights.

Additionally, the court found Father has a "demonstrated" ability to parent effectively [58] and, therefore, is a fit and proper person to have custody of Baby Girl. Despite acknowledging that Appellants would surely be excellent parents were Baby Girl to remain in their custody, the family court concluded Appellants failed to meet their burden of proving Father's continued custody of Baby Girl would result in severe emotional harm to the child. The family court's conclusion that Appellants failed to satisfy section 1912(f) was error.

At trial, Appellants presented the testimony of Dr. Bart Saylor, a qualified expert in familial bonding who conducted a bonding evaluation of Appellants and Baby Girl, testified that both adoptive parents seemed very well-adjusted, Baby Girl was a healthy little girl, and there was a strong emotional and psychological bond between them. He testified that severing the bond Baby Girl has formed with Appellants would, beyond a reasonable doubt, be "very traumatic" and "very disruptive" for the child. He further opined that severing that bond could produce "depression, anxiety, [and] it could cause disruption in [Baby Girl's] capacity to form relationships at a later age." Dr. Saylor concluded that her removal would "be taking away everything that she had come to know and count on for her comfort and security and replace it with something that would be completely unfamiliar and strange to her." Dr. Saylor further articulated that "it's not a matter of an alternative being favorable or unfavorable, you know, better or worse. It's just taking away what has been the very source and foundation of her security in her life...."

When asked during cross examination his opinion about Baby Girl's ability to bond with her biological family, Dr. Saylor testified that the fact that Baby Girl is healthy and happy bodes well for her resilience; however, he quickly cautioned that a substantial source of such health was her healthy and stable relationship with Appellants. In fact, Dr. Saylor stated the bond is "a good resource in this child's

---

58. This finding contains no support in the record.

psychological armament, but all the more sense of loss and disruption of losing that" will occur if the bond is severed.[59]

Dr. Saylor admitted he was unfamiliar with any specific studies suggesting a pattern of harm suffered by Native American adolescents who were raised by non-Indian adoptive families; he nevertheless testified that he would find such broad-based presumptions of "minimal utility in making that sort of a risk-assessment prediction." Although not discounting the significance of cultural heritage, Dr. Saylor noted that in terms of a child's bond with her caregiver, "it wouldn't have any relevance one way or the other to this bonding assessment, whether it was Native American, African American, European [heritage], that—that would not be the issue." Essentially, the relevant consideration in a bonding assessment is the family unit—the bond among the unique individuals, which is not necessarily defined by their cultural identity. Rather, according to Dr. Saylor, "the real variable that determines [children's] happiness and their success and their identity is that loving interaction with [their] family." Dr. Saylor ultimately opined that he believed beyond a reasonable doubt that the removal of Baby Girl from Appellants care would cause serious emotional harm. I find Dr. Saylor's testimony is credible and persuasive.

On behalf of Cherokee Nation, Tiffany Dunaway, an employee and case worker with the tribe, testified the tribe's recommendation was for Baby Girl to be placed with her natural father.[60] Dunaway was qualified as an expert in Cherokee Indian culture and Cherokee Indian practices. Dunaway received a bachelor's degree in family life education,

---

59. Dr. Saylor further explained:
   Could it be that if she'd had multiple caregivers and the bond was less well established, it might be easier for her to make another transition, I mean, possibly so. She might not be as healthy and happy a child on the surface, but making the transition might be easier. But I just don't think you can say that because she's happy and has been a well-cared for child that that would make it easier. *I think it could actually make it harder.*
   (emphasis added).

60. The bulk of Ms. Dunaway's testimony concerns the preference of Cherokee Nation regarding Baby Girl's adoptive placement. However, section 1912(f) does not contemplate the consideration of tribal preference in determining harm suffered by the child.

but she has no formal training on bonding and attachment. In preparation for trial, she never met or evaluated Baby Girl or Appellants and she met Father only once briefly. Additionally, Dunaway admitted that she had never seen Father interact with *any* child of *any* age. Nevertheless, Dunaway was certain that Baby Girl would do well in Father's custody and would not be permanently harmed by severance of the bond Baby Girl has established with Appellants. Dunaway admitted she had no information about Father's ability to parent; nonetheless, she testified, "I have no doubt that this father [can] raise his child." Dunaway's opinion was based on a home visit she conducted with Father and paternal grandparents and a separate home study of the paternal grandparents, conducted while Father was not residing there.[61] Further, Dunaway acknowledged her opinion that Baby Girl would thrive if placed in that home was based on anecdotal experience alone. Dunaway admitted she was unaware of any studies that show the percentage of transitioned children who thrive long-term following reunification with their Indian families. On cross-examination, the following exchange took place:

Q. When you said yesterday that Baby Girl would just do wonderful at [Father's], you really don't know that for sure, do you?

A. And—and I think I said that. I think I said, you know, we don't know what the future is going to be. I've transitioned children her age and that are older than her and they thrive. They've done well. So I can only go off of my experience on that.

Q. Your personal experience?

A Yes, through work.

---

61. Dunaway distinguished a "home assessment," which she conducted in this case, from a "full-blown home study," which she acknowledged she is not qualified to perform without additional training and certification. It appears the home study of paternal grandparents was conducted by another employee of Cherokee Nation for the purpose of approving paternal grandparents as an alternative placement during Father's military service. Dunaway explained that a home study of Father was not conducted because "[the tribe] didn't need one on him," notwithstanding her admission that the tribe had no information regarding Father's ability to parent.

Q   And—and you've not had any children who didn't thrive?

A.   You know, I've had children who've had difficult times.

Q.   How many?   Because yesterday you said they all were successful.

A.   I—you know, well they—they are successful.   I think the children are thriving.   I think there are a couple of girls who were—they're—I think they're 12 and 8 now. At first they were needing counseling.   They, you know, they were older.

Q.   Right. I don't want to get into anecdotal.   Give me statistics.

A.   I don't have those.

Q.   Give me some hard statistics and don't tell me personal stories.   Tell me how many children are not thriving?

A.   I don't have those.

Q.   Why wouldn't you?

A.   I don't keep those.

Q.   You don't really know, do you?

A.   I don't keep those things.

Q.   You don't know.   So yesterday when you said they were all successful you don't really know how many of those are successful today, do you?

A.   No, I don't.

. . .

Q.   But as you sit here today to testify you don't really have any studies completed or in your file in terms of a two-year old being taken out of a primary caregiver's home, a two-year old who only knows this couple as [ ] their only psychological parent, her only psychological parent, you don't have any studies in your file as to how the children you've monitored have done when they've been ripped out of an adoptive family's home and placed into someone's she doesn't even know?

A.   I can only testify as to my experience.

[witness instructed by court to answer the question]

A. No, we do not have statistics. And the Tribe may have statistics; I don't have them. I can just—So, no, I do not have them.

Q. So you're prepared to say that this child who has never been with the biological father should be removed from the home that this child was—the only home that this child has known and put into an entirely strange environment with a father where there's no information about his ability to parent?

A. Yes.

Yet the family court was persuaded, as is the majority, by Dunaway's testimony. While I believe Dunaway's testimony reflects insight into Cherokee Nation's traditions and an understanding of the importance of cultural heritage in an Indian child's development, with respect, I find Dunaway's views, expressed as a representative of Cherokee Nation regarding the tribe's placement recommendation, are not persuasive in this case as they relate to the determination of whether Baby Girl would suffer harm if removed from Appellants' custody. Further, in light of her lack of expertise in the area of bonding, her lack of interaction with Baby Girl and Father, and her reliance on purely anecdotal evidence, I find Dunaway's opinion regarding Baby Girl's emotional well-being lacks credibility. *See In re Robert T.*, 200 Cal.App.3d 657, 246 Cal.Rptr. 168 (1988) (approving the family court's failure to give weight to an expert witness's testimony regarding lack of harm to child when witness had never met child or adoptive family). Thus, on the whole, I find Dunaway's testimony unpersuasive.

Respondents argue Dr. Saylor's expert testimony should have been excluded because he was not a qualified expert under ICWA due to his lack of knowledge specifically related to Indian culture. I reject Respondents' contention that Dr. Saylor was not properly qualified as an expert. While I acknowledge testimony of an expert witness who possesses knowledge of Indian culture may be helpful, it is not required by section 1912(f). Moreover, where the basis for termination of parental rights is unrelated to Indian culture, the need for expert testimony possessing a familiarity with such culture becomes less crucial. *See Marcia V. v. State*, 201 P.3d 496,

504 (Alaska 2009) (stating "when the basis for termination is unrelated to Native culture and society and when any lack of familiarity with culture mores will not influence the termination decision or implicate cultural bias in the termination proceeding, the qualifications of an expert testifying under § 1912(f) need not include familiarity with Native culture"); *see also* Bureau of Indian Affairs ("BIA") Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67594 (1979) (indicating expert testimony by someone that has knowledge of tribal cultural and childrearing practices may be valuable to a court, but is not required). Furthermore, I see no basis for finding that severing the bond between a two-year old Indian child and the only caregivers she has ever known would be less traumatic and disruptive than if the child were a non-Indian.[62]

I also find the family court improperly interpreted section 1912(f)'s "damage" as encompassing only long-term harm. Section 1912(f) contains no such limitation on the damage

---

62. The majority finds it would be inappropriate to consider the bonding that occurred between Baby Girl and Appellants during litigation, and cites *Holyfield* support of this finding. However, I view this as another instance in which the majority misapprehends that opinion.

In *Holyfield*, the adoptive parents argued the bonding which took place during the pendency of the litigation defeated the tribe's exclusive jurisdiction. The United States Supreme Court found the express language of section 1911(a) could not be ignored in spite of the potential finding of the tribal court upon remand that the Indian children should be removed from their non-Indian adoptive home. In that vein, the Supreme Court stated:

Whatever feelings we might have as to where the twins should live, however, it is not for us to decide that question. We have been asked to decide the legal question of who should make the custody determination concerning these children—not what the outcome of that determination should be. The law places that decision in the hands of the Choctaw tribal court. Had the mandate of [section 1911(a) of] the ICWA been followed in 1986, of course, much potential anguish might have been avoided, and in any case the law cannot be applied so as automatically to "reward those who obtain custody, whether lawfully or otherwise, and maintain it during any ensuing (and protracted) litigation." It is not ours to say whether the trauma that might result from removing these children from their adoptive family should outweigh the interest of the Tribe—and perhaps the children themselves—in having them raised as part of the Choctaw community. Rather, "we must defer to the experience, wisdom, and compassion of the [Choctaw] tribal courts to fashion an appropriate remedy."

requirement. By its terms, section 1912(f) requires only proof of serious emotional or physical harm to the child. I believe this particular provision of ICWA is designed specifically to protect the best interests of the child, which necessarily includes the child's short-term well-being. This does not mean, however, long-term considerations are irrelevant. Dr. Saylor opined that severing the bond between Baby Girl and Appellants had the potential to negatively affect *Holyfield*, 490 U.S. at 53–54, 109 S.Ct. 1597 (quoting *In re Adoption of Halloway*, 732 P.2d 962, 971–72 (1986) ("While stability in child placement should be a paramount value, it cannot be the sole yardstick by which the legality of a particular custodial arrangement is judged.... In any event, here we have no choice in the matter: [section 1911(a)] prohibits the Utah courts from exercising jurisdiction. Instead, we must defer to the experience, wisdom, and compassion of the Navajo tribal courts to fashion an appropriate remedy. We hope the tribal courts will consider the tribe's slow response to the notice of the Utah adoption proceedings as well as the value of stability in child placement and will recognize the strong bonds [child] has developed with his adoptive parents.... [W]e are confident that the courts of the Navajo Nation will give the petition for adoption the careful attention it deserves *and will act with the utmost concern for [child's] well-being")* (emphasis added)).

Further, I note that, following remand to the tribal court in *Holyfield*, the Choctaw tribal court judge balanced the tribe's interests in preserving tribal communities against the children's interests in continuity and stability, and concluded it was in the children's best interests to remain with the non-Indian adoptive parent. *See* Maldonado, *supra*, at 17–18. This lends further support for the proposition that the best interests inquiry is not ousted by ICWA and that bonding is a highly relevant consideration.

Baby Girl as an adult. However, Dr. Saylor candidly acknowledged that long-term effects of such traumas are subject to a host of varying factors and are therefore unpredictable.[63]

---

**63.** Respondents additionally suggested through cross-examination of Dr. Saylor that his testimony should be discounted because he refused

Finally, I find the family court erred in discounting Dr. Saylor's testimony because he attributed Baby Girl's emotional harm to only her removal from Appellants' care and not her return to Father's care. Initially, although Father never assumed or sought physical custody of Baby Girl, I recognize, as have other courts, that "continued custody" under section 1912(f) refers not only to physical custody, but legal custody as well.[64] *See D.J. v. P.C.*, 36 P.3d 663 (Alaska 2001) (noting section 1912 termination provisions are applicable even where parent never had physical custody but whose custodial rights had not been terminated); *In re Adoption of a Child of Indian Heritage*, 111 N.J. 155, 543 A.2d 925, 938 (1988) ("[T]he reference to 'custody' in section 1914 refers to a parent's legal, rather than physical, relationship with a child."). Nonetheless, it is apparent from the circumstances before us that section 1912 must be applied in the context of the facts of the particular case. The critical feature here is that Father deliberately avoided developing a parent-child relationship with Baby Girl. Thus, no father-daughter relationship exists upon which to base an evaluation.

Here, Father chose not to be a parent for an extended period of time. In addition, there is compelling evidence that Baby Girl would suffer serious emotional damage if removed from the physical custody of Appellants. In this case, although the record raises substantial questions as to Father's fitness as a parent, ICWA does not require the presentation of

---

to "conclusively" testify that Baby Girl would suffer "irreparable harm" if Father were awarded custody. I reject this effort to discount Dr. Saylor's testimony. The statute imposes a beyond a reasonable doubt standard and speaks in terms of "serious harm," not irreparable harm. In addition, I find Dr. Saylor's measured responses and caution against making broad generalizations reflective of an objective and credible expert witness. Dr. Saylor's measured responses and candor are refreshing when contrasted with the "all in" expert, like Dunaway.

64. The majority asserts that the "plain language" of section 1912(f) "requires a showing that the *transferee* parent's *prospective* legal and physical custody is likely to result in serious damage to the Indian child." (emphasis added). Section 1912(f) says no such thing. The majority's attempt to engraft into the statute the terms "transferee" and "prospective" must be rejected. The text of section 1912(f) requires a showing that "the *continued* custody of the child by the parent or Indian custodian" would result in emotional harm to the child. (emphasis added).

additional evidence showing that a biological parent could not provide a good home for the child. *See In re Adoption of Baade*, 462 N.W.2d 485, 490–91 (1990) (reasoning that if parent retained legal custody of the child, the adoptive couple would be unable to adopt him and would have no basis for maintaining physical custody; as a result, the father's continued legal custody would result in the child having to leave the adoptive couple, which would produce serious emotional damage). Thus, "[w]hen the child is not in the custody of the parents for a protracted period of time, as in this case, it would be irrelevant to receive testimony as to whether or not the continued custody of the child by the parents will harm the child." *In re the Interest of D.S.P.*, 166 Wis.2d 464, 480 N.W.2d 234, 240–41 (1992). I would adopt this well-reasoned approach. Since Father has never made meaningful attempts to establish a relationship with Baby Girl, the distinction drawn by the family court is incongruous with the facts before us. I therefore find the appropriate analysis of section 1912(f) requires only an examination of the likelihood of serious emotional harm if the child were removed from Appellants, the sole caregivers Baby Girl has ever known.

In light of Dr. Saylor's testimony regarding the deep and nurturing bond formed between Appellants and Baby Girl, if Father were to retain continued legal custody, thereby preventing Appellants from retaining physical custody of the child, I am persuaded beyond a reasonable doubt that Baby Girl would suffer severe emotional harm. Thus, I conclude Appellants have satisfied the requirements of section 1912(f).

## b.

## Active Remedial Efforts

In addition to other protections afforded by ICWA, section 1912(d) requires that, before a parent's rights may be terminated, a court must determine if active efforts to provide remedial services have been made. Specifically, that section states:

> Any party seeking to effect a ... termination of parental rights to[ ] an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent

the breakup of the Indian family and that these efforts have proved unsuccessful.

25 U.S.C. § 1912(d). The remedial efforts should be directed at remedying the reason that led to removal. *Adoption of Hannah S.,* 142 Cal.App.4th 988, 48 Cal.Rptr.3d 605, 612 (2006); *see also Matter of Baby Boy Doe,* 127 Idaho 452, 902 P.2d 477 (1995) (holding that the types of remedial and rehabilitative services to be required under ICWA depend on the facts of the case).

The legislative history of subsection (d) suggests that Congress intended for the Federal standard regarding active efforts to mirror state law standards after which it was patterned:

> The committee is advised that most State laws require public or private agencies involved in child placements to resort to remedial measures prior to initiating placement or termination proceedings, but that these services are rarely provided. This subsection imposes a Federal requirement in that regard with respect to Indian children and families.

H.R.Rep. No. 1386, at 22 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7545. *See also Adoption of Hannah S.,* 142 Cal.App.4th 988, 48 Cal.Rptr.3d 605 (finding active efforts are essentially equivalent to reasonable efforts to provide reunification services under state law); *In re Baby Boy Doe,* 127 Idaho 452, 902 P.2d 477 (accord). Like most states, South Carolina requires reasonable efforts to be made to reunify a family following the removal of a child from a parent's custody. *See* S.C.Code Ann. § 63–7–1640 (South Carolina's family preservation statute setting forth requirement that "reasonable efforts to preserve or reunify a family" have been made by Department of Social Services).

Initially, it is clear Congress envisioned section 1912(d) to apply in the removal context. *See Holyfield,* 490 U.S. at 32, 109 S.Ct. 1597 (noting the legislative history of ICWA demonstrates Congress was concerned with "the wholesale *removal of Indian children from their homes,* the most tragic aspect of Indian life today" (emphasis added) (internal quotations omitted)). Likewise, in terms of the state standards referenced in the House Report, South Carolina's reasonable efforts requirement is applicable when a child has been removed from

the parent's custody. *See* S.C.Code Ann. §§ 63–7–1640 (noting child's health and safety are the paramount concern with regard to state's reasonable efforts to preserve or reunify a family); 63–7–2570(2) (establishing that parent must comply with terms of state plan and remedy the conditions which caused removal).[65] To be clear, I do not find the absence of a removal action in the traditional sense dispositive of the active efforts requirement of section 1912(d); however, I merely acknowledge the reality that because the circumstances before us do not involve removal, the application of section 1912(d) is not straightforward. *See In re J.S.*, 177 P.3d 590 (Okla.Civ. App.2008) (finding the active efforts provision of section 1912(d) eludes definition and therefore should be determined by courts on a case-by-case basis). As an additional difficulty, the parties seeking the termination of parental rights are Appellants, not the state. I acknowledge that the absence of the state social services agency as a party to this proceeding does not render section 1912(d) inapplicable; however, as a practical hurdle, its resources cannot be utilized to comply with the active efforts requirement. Overwhelmingly, most cases applying section 1912(d) encompass issues relating to vocational rehabilitation, alcohol or substance abuse, mental health issues, lack of parenting skills, or domestic violence allegations, all of which may be treated through counseling and education provided through child protection agencies. *See, e.g., In re K.B.*, 173 Cal.App.4th 1275, 93 Cal.Rptr.3d 751 (2009) (noting that county department of public social services satisfied the active efforts requirement where department provided mother with referrals to inpatient substance abuse program, parent class, homemaking assistance, and a class designed to educate parents on issues of sexual abuse); *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008) (affirming finding that state department's case manager assisted mother in locating and applying for inpatient chemical dependence programs, provided list of job skill development programs, referred her for a mental health evaluation, assisted her in finding housing, and provided bus tickets for trans-

---

**65.** Further connecting the provision of rehabilitative services to the removal context, such services may also be offered to parents proactively to prevent a child's removal in the first instance. *See* S.C.Code Ann. § 63–7–1650 (permitting state to provide services to abused and neglected children without the removal from custody).

portation to Alcoholics Anonymous, Narcotics Anonymous, and visitations with her child).

In the case before us, termination of parental rights is sought on the basis of Father's willful abandonment of parental rights and responsibilities. Yet, Father claims active efforts were not offered because he was not advised of his parental rights, Mother concealed her plan for adoption, no one ever demanded child support from him, and a child support proceeding was not initiated. I find disingenuous Father's claimed lack of awareness of his parental rights—by his own admission he knew of Mother's pregnancy and was informed of Baby Girl's expected due date. In fact, Father relies on his early acknowledgement of paternity in support of his claim as an ICWA parent pursuant to section 1903(9).

I further find Father's expectation to be notified of Mother's adoption plan is unreasonable in light of his expressed desire (verbally and in writing) to "give up" his parental rights and his prolonged failure to inquire about the child after her birth. Moreover, Father undoubtedly knew of the adoption when he was served with pleadings in this lawsuit in January 2010. Yet, other than his intervention in the adoption proceeding, his conduct towards Baby Girl remained unchanged until February 2011 when he first attempted to support the child.[66]

For purposes of invoking constitutional and statutory protections afforded an unwed father, a father's support for an expected child is an obligation that arises at the instant the father learns of the pregnancy and continues after the child's birth. It is of no moment that a father is under no family court order requiring support payments. *See S.C. Dep't of Soc. Servs. v. Cummings*, 345 S.C. 288, 547 S.E.2d 506 (Ct. App.2001) (finding formal notice of a parental duty to support is not required before failure to discharge such duty may serve as grounds for termination of parental rights); *S.C.*

---

**66.** This Court has previously stated:

> Even in the most acrimonious of situations, a[n unwed] father-to-be can fund a bank account in the mother-to-be's name. He can have property or money delivered to the mother-to-be by a neutral third party. He can—and must—be as creative as necessary in providing *material assistance* to the mother-to-be during the pregnancy and, the law thus assumes, to the child once it is born.

*Reeves*, 392 S.C. at 153, 708 S.E.2d at 783.

*Dep't of Soc. Servs. v. Parker,* 336 S.C. 248, 258, 519 S.E.2d 351, 356 (Ct.App.1999) ("[N]othing in [63–7–2570] requires a parent be 'notified' of his duty to support or visit [child] before failure to discharge those duties may serve as grounds for termination of parental rights."). This settled law stands in contrast to the family court's finding that Father's parental rights would not be terminated under state law for failure to support because, in part, Appellants never requested support from Father.

Further affecting the active efforts requirement is the basis for termination of Father's parental rights—his abandonment of Baby Girl. Father claims his abandonment was conditioned on his belief that Mother would raise the child—not place her for adoption. Now Father contests Baby Girl's adoption and argues termination of his parental rights is improper because active remedial efforts have not been made to prevent the breakup of his family. I do not follow Father's logic. The breakup of the Indian family does not turn on whether Baby Girl is raised by her mother or by Appellants—rather, the breakup of Father's Indian family was occasioned by Father's unwillingness to become involved in the child's life, a decision he made long before he learned of the adoption proceedings. *See In re N.B.,* 199 P.3d 16, 25 (2007) ("The active efforts inquiry [of section 1912(d) ] focuses on *reunifying* the broken Indian family." (emphasis added)).

A finding of abandonment necessarily encompasses "conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child." *Hamby v. Hamby,* 264 S.C. 614, 617, 216 S.E.2d 536, 538 (1975). As the family court found in this case:

> During [Mother's] pregnancy and after the child's birth, [Father] was a full time member of our military, earning income. Though he had the ability to do so, he never attempted to offer any type of meaningful support to [Mother] or his child. In essence, prior to being served with the adoption lawsuit when the child was four months old, [Father] made no "meaningful attempts" to assume his responsibility of parenthood.... [67]

---

67. Despite this finding, the family court concluded Father did not willfully fail to support the child under state law.

Under the facts presented, I ask: what active efforts are envisioned under section 1912(d) where, as here, the parent has consistently avoided parental rights and responsibilities? In my judgment, it would defy common sense and ignore the reality of the facts of this case to construe Congressional intent to mandate a futile act. Because active efforts are aimed at remedying the conditions which threaten the parent-child relationship, in my opinion, Father's unilateral abandonment cannot be corrected by remedial services or rehabilitative programs. *See Adoption of Hannah S.,* 48 Cal.Rptr.3d at 612 (finding party seeking termination of parental rights was not required to make active efforts based on father's abandonment and felony convictions resulting in a prison term). Appellants cannot reasonably be expected to provide such services to someone who has expressed, in both actions and words, an unwillingness to form a parent-child relationship. *See In re Welfare D.K.,* No. A10–550, 2010 WL 4181454, at *2 (Minn.Ct.App. Oct. 26, 2010) (affirming family court's ruling that active efforts were made in part because father had not visited child in over a year despite living near the child, missed a scheduled visit without explanation, and father's failure to visit was attributable to his subjective feelings that visiting was inconvenient rather than to county's failure to provide assistance); *In re Children of J. L. W.,* No. A05–20, 2005 WL 1804833, at *6 (Minn.Ct.App. Aug. 2, 2005) (holding social workers' efforts would have been futile in part because father never had a relationship with children, initially denied paternity as to both, and had previously shown no interest in being a parent).[68]

---

**68.** In rejecting futility as an option under section 1912(d), the majority states that Father must receive rehabilitative services even if one assumes "Father did not want custody of Baby Girl and did not desire to act as a parent to her." What the majority expresses as an assumption is in fact the reality of this case. Lost in the academic discussion and rigid application of legal principles is a child whose birth father abandoned her from the moment he learned of the pregnancy. The majority construes ICWA to require active remedial efforts to an Indian parent regardless of the facts. I could not disagree more strongly, as I believe Congress intended section 1912(d) to be construed through the lens of the facts of the particular case and the best interests of the Indian child. The majority's rigid approach to section 1912(d) cannot be reconciled with an approach that seeks a result consistent with the best interests of the Indian child. I am simply not persuaded that

Any "rehabilitation" or attempt at curing Father's refusal to undertake the responsibilities that come with being a parent was squarely and completely within his own control. *See Reeves,* 392 S.C. at 150, 708 S.E.2d at 782 ("[I]t is only if [a father] grasps that opportunity and accepts some measure of responsibility for the child's future may he enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development."); *Abercrombie v. LaBoon,* 290 S.C. 35, 348 S.E.2d 170 (1986) (finding curative conduct after initiation of an action for termination of parental rights may be considered by the court, but only rarely would such judicially motivated repentance standing alone warrant a finding that an abandonment was cured). Accordingly, in line with other courts that have reached the same conclusion, I believe it is unnecessary to require a showing of reunification efforts because such efforts would be futile under these circumstances. *See, e.g., In re N.B.,* 199 P.3d at 25 ("The facts showing abandonment will vary widely from case to case, and determining futility in any given case would be a factual matter necessarily left to the trial court.") (citing *In re Baby Boy Doe,* 902 P.2d at 484).

Although I have previously examined Father's abandonment at length, I mention it again only to point out that, at the time Baby Girl was placed with Appellants, there was no indication Father had any interest in grasping his opportunity as a parent. To the contrary, every indication from Father was that he was totally uninterested regarding Baby Girl's future and well-being and that he wished to "give up" his parental rights. Further, in the Oklahoma action, Father's initial

application of section 1912(d) is meant to relieve a parent of a purposeful decision not to be a parent, which is a decision that is entirely unconnected to any need for rehabilitative services. Given Father's purposeful decision to abandon parental rights and responsibilities, I find absurd the Court's suggestion that Appellants should have "attempt[ed] to stimulate Father's desire to be a parent or to provide necessary education regarding the role of a parent." I view this as requiring not merely efforts to rehabilitate a nonexistent parent-child relationship, but rather to perform a miracle. The Court's suggestion illustrates the futility of providing rehabilitative services in this case. It is a tragic end that Appellants, whose conduct is implicitly characterized as unlawful, are now blamed for not "stimulating" Father to become a real parent.

complaint indicated that neither he nor Baby Girl were Native American, and stated ICWA was inapplicable.[69]

While I recognize ICWA's laudable policy of preserving and reunifying American Indian families where possible, I cannot accept that Congress intended to force superfluous attempts aimed at mending nonexistent parent-child relationships. Certainly, the Act "does not do so at the expense of a child's right to security and stability." *In re C.A.V.*, 787 N.W.2d 96, 104 (Iowa Ct.App.2010). Application of section 1912(d) is not meant to relieve a parent of a purposeful decision not to be a parent, which is a decision that is entirely unconnected to any need for rehabilitative services and unrelated to the unique familial and child-rearing culture of the Cherokee Nation. Accordingly, I conclude no efforts could have prevented the breakup of this Indian family.

Based on the foregoing, I would terminate Father's parental rights with respect to Baby Girl in accordance with section 63–7–2570 of the South Carolina Code and section 1912 of ICWA.

## D.

### Adoptive Placement

A termination of Father's parental rights does not end this matter. It must be determined if adoption of Baby Girl by Appellants is appropriate in light of ICWA's adoption placement preferences. ICWA mandates that

> In any adoptive placement of an Indian child under State law, a preference shall be given, *in the absence of good cause to the contrary*, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.

25 U.S.C. § 1915(a) (emphasis added). Congressional history indicates that "[Subsections 1915(a) and (b) ] establish a Federal policy that, where possible, an Indian child should remain in the Indian community, *but is not to be read as precluding the placement of an Indian child with a non-Indian family.*" H.R.Rep. No. 1386, at 22 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7546 (emphasis added). The emphasized

---

69. I fully appreciate that Father's complaint was later amended to allege ICWA's applicability.

language is, in my judgment, tied to the underlying Congressional intent to serve the best interests of the child.

Cherokee Nation contends Appellants' motion to finalize the adoption of Baby Girl should be denied because they failed to establish good cause to deviate from the placement preferences set forth in section 1915. According to the tribe, Appellants failed to demonstrate any of the factors set forth in BIA Guidelines warranting deviation from the preferences set forth in section 1915.[70] At oral argument before this Court, counsel for Cherokee Nation stated "The [Appellants] would be the last people available to adopt this child even if [Father] was out of the picture." That statement is chilling, for it demonstrates the tribe's lack of concern for the best interests of this unique child. I note that paternal grandparents are not parties to this action, and although Cherokee Nation has intervened and expressed its recommendation regarding adoptive placement of Baby Girl, that recommendation is not dispositive. *See In re J.R.S.*, 690 P.2d 10, 17 (Alaska 1984) ("ICWA entitles the tribe to influence over adoptive placements, not to adoptive rights themselves.").

I believe that the Indian child's best interests are of primary consideration in adoption proceedings, notwithstanding the tribe's preference to the contrary. *See* S.C.Code Ann. § 63-9-20 (stating that in adoption proceedings "when the interests of a child and an adult are in conflict, the conflict must be resolved in favor of the child."); *In re Appeal in Maricopa Cnty. Juvenile Action No. A–25525*, 136 Ariz. 528, 667 P.2d 228, 234 (Ct.App.1983) (finding ICWA's declared policy emphasizes that the first interest Congress seeks to protect is that of Indian children); *see also* 25 U.S.C. § 1902. "[I]t is patently clear that Congress envisioned situations in which the child's best interest may override a tribal or family

---

**70.** The BIA Guidelines offer examples of the kinds of factors that can provide good cause to deviate:

(i) The request of the biological parents or the child when the child is of sufficient age.

(ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.

(iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.

BIA Guidelines, 44 Fed. Reg. 67584, 67594 (1979).

interest.....*" Maricopa Cnty.,* 136 Ariz. 528, 667 P.2d 228, 234 (Ct.App.1983) (quoting 25 U.S.C. § 1915(a), (b)).

Further, the BIA Guidelines may assist the Court, but they are not binding, nor are they an exhaustive list. *See* BIA Guidelines, 44 Fed. Reg. 67584, 67594 (1979) ("[T]hese guidelines ... are not published as regulations because they are not intended to have binding legislative effect."). Although ICWA and the BIA Guidelines draw attention to relevant considerations, the best interests of the child remain paramount.[71] *See Adoption of N.P.S.,* 868 P.2d 934 (Alaska 1994); *Maricopa Cnty.,* 136 Ariz. 528, 667 P.2d 228 (App.1983); *In re Interest of Bird Head,* 213 Neb. 741, 331 N.W.2d 785 (1983).

I would hold that good cause exists to deviate from the adoptive placement preferences of section 1915(a). Baby Girl has resided with Appellants for two years. A close parent-child relationship with each of the adoptive parents has been established, and her removal would cause severe emotional damage. *See Maricopa Cnty.,* 667 P.2d at 234 (affirming family court's finding of good cause where the child had resided with the adoptive mother for three years, that a close mother-child relationship had been established, and that the baby's removal would cause psychological damage). Addition-

---

**71.** The majority finds that Appellants' showing of good cause must be ignored because Baby Girl was unlawfully removed from Oklahoma shortly after her birth and wrongfully placed with Appellants in South Carolina, such that any subsequent bonding cannot be relied upon to establish good cause. Further, the Court faults Appellants for failing to notify the tribe that Baby Girl was to be removed from Oklahoma and cites to the Cherokee Nation's sovereign authority in determining the fate of its children.

While I have previously expressed my frustration with the Court's misreading of *Holyfield* and resurrection of unappealed rulings, I am compelled to note that Baby Girl was removed from Oklahoma only after receiving a letter from Cherokee Nation indicating that she would not be considered an Indian Child and that ICWA was not applicable. Although Cherokee Nation cannot be penalized for receiving incomplete information in the initial inquiry, it likewise cannot be rewarded for engaging in the most cursory of investigations into this child's heritage, notwithstanding Mother's unequivocal assertions that Father was an enrolled member of the Cherokee Nation. I construe the events following that initial response from Cherokee Nation as Appellants' good-faith reliance on the tribe's representations that Baby Girl was not Cherokee and ICWA was not applicable. Ignoring the bonding that occurred here is simply ignoring the reality of this case.

ally, Mother has consistently expressed her desire that Baby Girl be placed with Appellants. ICWA expressly provides that courts should consider the preference of a parent.[72] *See* 25 U.S.C. § 1915(c) ("Where appropriate, the preference of the Indian child or parent shall be considered ..."); *see also In the Adoption of F.H.*, 851 P.2d 1361 (Alaska 1993) (holding mother's preference for placement with non-Indian, adoptive parents was appropriate factor in finding good cause). Moreover, Appellants have expressed and demonstrated a desire and willingness to introduce Baby Girl to her Indian culture.[73] Section 1917 permits an adopted Indian child to receive information on his or her "tribal affiliation ... and ... such other information as may be necessary to protect any rights flowing from the individual's tribal relationship" upon reaching the age of eighteen. 25 U.S.C. § 1917. Thus, I am persuaded that Baby Girl will have a knowledge of and appreciation for her cultural heritage. *See In re Robert T.*, 246 Cal.Rptr. at 176 (holding that the Native American child's best interests were to remain with his adoptive parents since they have bonded well and have encouraged him to learn about and visit his cultural roots).

In light of the totality of the evidence, including the strong emotional parent-child bond formed between the Appellants and Baby Girl, the harm that would be caused if Baby Girl were removed from the only parents she has ever known, Mother's expressed preference, and Appellants' dedication to exposing the child to her Indian heritage, I would hold good cause exists to deviate from the placement preferences of ICWA.

---

**72.** By way of supplemental citation, Father contends Mother's preference that Baby Girl be placed with Appellants is, standing alone, insufficient to constitute good cause warranting deviation from section 1915(a). *See In re T.S.W.*, 276 P.3d 133 (Kan.2012) (holding placement preference of birth mother alone does not constitute good cause to deviate from placement preferences under ICWA). I do not disagree. Although I recognize that the placement preference of a birth mother standing alone may be insufficient, here, Mother's preference, although certainly relevant, is only one of several factors in my analysis. The totality of the circumstances, in my judgment, compels a finding of good cause to deviate from the section 1915 placement preferences.

**73.** I reject Cherokee Nation's contention that the interests of an Indian child are always better served by placement with an Indian family.

## IV.

## CONCLUSION

I dissent and would reverse the judgment of the family court. I would terminate Father's parental rights pursuant to section 63–7–2570 of the South Carolina Code of Laws and in accordance with ICWA. Additionally, I would hold there is good cause to deviate from ICWA's adoptive placement preferences and remand for an immediate entry of judgment approving and finalizing the adoption of Baby Girl by Appellants. And finally, I would require the immediate return of Baby Girl to Appellants.

HEARN, J., concurs.

Justice HEARN.

Without hesitation, I join Justice Kittredge's thoughtful, well-reasoned, and excellent dissent. Like Justice Kittredge, I view both the pertinent facts of this case—facts which emanate solely from Father's conduct—and the legal principles underlying termination of parental rights and adoption as requiring judgment in favor of Adoptive Couple. My review of the record convinces me that Father turned his back on the joys and responsibilities of fatherhood at every turn. I would not minimize, as the majority does, the telling fact that Father told Mother in writing after Baby Girl's birth that he would relinquish his parental rights rather than support her and Baby Girl, and I do not join the majority in accepting his laughable explanation that he did this as a way to convince Mother to marry him. In stark contrast to Father's behavior in completely shirking his parental responsibilities, every action taken by Adoptive Couple since they learned she was going to be their child has demonstrated their deep and unconditional love and commitment to Baby Girl. Nevertheless, today, the majority goes out of its way to re-cast the facts in a light unfavorable to Adoptive Couple and overlooks Father's clear course of conduct, affording him a second chance at fatherhood, all at great emotional cost to Baby Girl and Adoptive Couple.

Apart from the human tragedy that Father's reluctance to act like a father until the eleventh hour has wrought on Baby

Girl, Adoptive Couple, and their extended family, I profoundly disagree with the majority's elevation of the Indian Child Welfare Act (ICWA) to a position of total dominance over state law and settled principles of the best interests of the child, a position which I find totally unsupported by ICWA jurisprudence. As Justice Kittredge demonstrated, Father's last-ditch efforts to embrace a relationship with his daughter under the cloud of litigation are far too little and much too late. I cannot fathom that Congress intended ICWA to require the return of a child to a parent who consistently, by his words and actions, evinced a desire to forego his responsibilities as a father. I therefore wholeheartedly join Justice Kittredge's dissent and would order Baby Girl's return to Adoptive Couple.

KITTREDGE, J., concurs.